**R.3080**

**Order Addressing Arguments etc. re: Rio Grande LNG, LLC, et al.,**

**185 FERC ¶ 61,080 (Oct. 27, 2023)**

185 FERC ¶ 61,080
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
                       James P. Danly, Allison Clements,
                       and Mark C. Christie.

Rio Grande LNG, LLC                          Docket Nos.  CP16-454-006
Rio Bravo Pipeline Company, LLC                           CP16-455-003
                                                          CP20-481-001

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued October 27, 2023)

1.      On April 21, 2023, the Commission issued an order on remand[1] reaffirming that
Rio Grande LNG, LLC's (Rio Grande) proposed liquified natural gas terminal project
(Rio Grande LNG Terminal) and Rio Bravo Pipeline Company, LLC's (Rio Bravo)
proposed pipeline project (Rio Bravo Pipeline Project) (together, projects), as amended,
are, respectively, not inconsistent with the public interest under section 3 of the Natural
Gas Act (NGA)[2] and required by the public convenience and necessity under NGA
section 7.[3]  On May 22, 2023, Vecinos para el Bienestar de la Comunidad Costera, Sierra
Club, City of Port Isabel, and the Carrizo/Comecrudo Tribe of Texas (together, Sierra
Club) filed a timely rehearing of the Remand Order.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[4] the rehearing request filed in this
proceeding may be deemed denied by operation of law.  However, as permitted by NGA

---

[1] *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Remand Order).

[2] 15 U.S.C. § 717b.

[3] *Id*. § 717f.

[4] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

section 19(a),[5] we are modifying the discussion in the Remand Order and continue to reach the same result in this proceeding, as discussed below.[6]

## I.    Background

3.       On November 22, 2019, the Commission authorized Rio Grande to construct and operate a new liquified natural gas (LNG) terminal designed to produce up to 27 million metric tonnes per annum (MTPA) of LNG for export pursuant to NGA section 3.[7]   The project facilities will occupy 750.4 acres of land on a 984.2-acre parcel on the northern embankment of the Brownsville Ship Channel in Cameron County, Texas,[8] and include five natural gas liquefaction trains, each with a nominal capacity of 5.4 MTPA;[9] four full-containment LNG storage tanks; two LNG carrier loading berths; one 1,500-foot-diameter turning basin; facilities for loading and unloading trucks; and other support

---

[5] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[6] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Remand Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[7] *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, at P 5 (2019) (Authorization Order).

[8] The parcel is owned by the Brownsville Navigational District, a political subdivision of Texas that operates the Port of Brownsville.  Rio Grande's parent company, NextDecade, executed an Option to Lease the acreage from the Brownsville Navigational District.  Authorization Order, 169 FERC ¶ 61,131 at P 7 n.12.

[9] On April 15, 2020, Rio Grande requested that the Commission approve a design change in its implementation plan for the Rio Grande LNG Terminal to reduce the Rio Grande LNG Terminal's number of liquefaction trains from six to five and to optimize parts of the liquefaction design to increase the liquefaction capacity of the five remaining trains from 4.5 million metric tons per annum (MTPA) to 5.4 MTPA each, while keeping the total export capacity at 27 MTPA.  The Commission granted that request, but we note that the 2019 authorization, as reviewed by the D.C. Circuit in *Vecinos*, authorized and considered the impacts associated with six natural gas liquefaction trains.  *See Rio Grande LNG, LLC*, 174 FERC ¶ 61,048, at P 4 (2021) (rehearing order affirming design changes authorized by Commission staff's August 13, 2020 Letter Order).

facilities.[10]  In the same order, the Commission also issued a certificate of public convenience and necessity, under NGA section 7, to Rio Bravo to construct and operate a new interstate natural gas pipeline system designed to provide up to 4.5 billion cubic feet per day (Bcf/d)[11] of firm natural gas transportation capacity from several interconnects in the vicinity of the Agua Dulce Hub in Nueces County, Texas, to Rio Grande's LNG export terminal (Rio Bravo Pipeline).

4.      On December 23, 2019, Sierra Club and several other parties jointly requested rehearing of the Authorization Order.  On January 23, 2020, the Commission denied rehearing.[12]  Sierra Club petitioned for review of the Authorization and Rehearing Orders in the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit).

5.      While Sierra Club's petition for review was pending before the court, Rio Bravo filed an application on June 16, 2020, under section 7 of the NGA, to amend its certificate for the Rio Bravo Pipeline Project (Amendment Project).[13]  Rio Bravo proposed to reduce the number of authorized compressor stations from three to one, increase the horsepower at the remaining compressor station, eliminate certain measurement facilities, extend both parallel pipelines by 0.2 mile, change the operating pressure of the pipelines and header system, and increase the diameter of one of the two pipelines from 42 inches to 48 inches.[14]  The Commission acted on Rio Bravo's application as part of the Remand Order.

6.      On August 3, 2021, the D.C. Circuit remanded the Authorization and Rehearing Orders, holding that the Commission's National Environmental Policy Act (NEPA) analyses of the project's impacts on climate change and environmental justice communities were deficient.[15]  On remand, the court directed the Commission to: (1) explain whether the Council on Environmental Quality's (CEQ) regulations at 40

---

[10] Authorization Order, 169 FERC ¶ 61,131 at PP 6-7.

[11] 4.5 Bcf/d is the equivalent of 4,500,000 dekatherms (Dth) per day assuming one Dth equals one Mcf of gas.

[12] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 (2020) (Rehearing Order).

[13] Rio Bravo, Application to Amend Certificate of Public Convenience and Necessity, Docket No CP20-481-000 (filed June 16, 2020) (Pipeline Amendment Application).

[14] Remand Order, 183 FERC ¶ 61,046 at P 13.

[15] *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (*Vecinos*).

C.F.R. § 1502.21(c) require the Commission, in its environmental analysis of the projects, to apply the social cost of carbon protocol or some other analytical framework, as "generally accepted in the scientific community" within the meaning of the regulation; and (2) explain why the Commission chose to analyze the projects' impacts only on environmental justice communities within a two-mile radius, or, in the alternative, to analyze the projects' impacts on communities within a different radius from each project site and to determine whether the Commission's environmental justice conclusion still holds.[16] Additionally, because the Commission's analyses of the project's impacts on climate change and environmental justice communities were deficient, the court directed the Commission to revisit its determinations about the public interest under NGA section 3 and about the public convenience and necessity under NGA section 7.[17]

7.    Following the D.C. Circuit's decision, Commission staff issued environmental information requests to Rio Grande on February 3, August 16, and August 31, 2022, and to Rio Bravo on May 2 and May 10, 2022. Rio Grande filed responses on March 3, August 22, September 15, and November 2, 2022, and Rio Bravo filed a response on June 1, 2022. Commission staff sought public comment on information provided in these responses.[18]

8.    Commission staff issued additional environmental information requests to Rio Grande on January 6 and February 10, 2023, and to Rio Bravo on December 9, 2022, and on January 9 and February 15, 2023. Rio Grande filed responses on January 20, January 27, February 13, and February 14, 2023 and Rio Bravo provided additional responses on December 29, 2022, and January 1 and February 21, 2023.

9.    In the Remand Order, the Commission addressed the issues remanded to the Commission by the court in *Vecinos* and supplemented the environmental analysis of both the Rio Grande LNG Terminal and the Rio Bravo Pipeline Project, by: (1) addressing the argument regarding the social cost of carbon and 40 C.F.R. § 1502.21(c);

---

[16] *Id.* at 1329-31. 40 C.F.R. § 1502.21(c) (2022) provides that "[i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known, the agency shall include within the environmental impact statement . . . [t]he agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." In its 2020 rulemaking, CEQ redesignated § 1502.22, "[i]ncomplete or unavailable information" as § 1502.21 in the final rule.

[17] *Vecinos*, 6 F.4th at 1329-31.

[18] *See Rio Grande LNG, LLC; Rio Bravo Pipeline Co., Notice Seeking Public Comment on Responses to Information Requests*, 87 Fed. Reg. 60,669 (Oct. 6, 2022) (Notice Seeking Public Comment).

and (2) updating our analysis of the projects' environmental justice impacts consistent with the Commission's current practice. In the Remand Order, the Commission determined that the Rio Grande LNG Terminal, as conditioned in the Authorization Order and modified in the Remand Order, is not inconsistent with the public interest.[19] Additionally, the Commission determined that the Rio Bravo Pipeline Project, as conditioned in the Authorization Order and as amended and modified in the Remand Order, is required by the public convenience and necessity.[20]

## II.     Procedural Issues

10.     On June 6, 2023, Rio Grande and Rio Bravo each filed a motion for leave to answer and answer to Sierra Club's rehearing request. The Commission's Rules of Practice and Procedure generally prohibit answers to a request for rehearing.[21] Accordingly, we deny Rio Grande's and Rio Bravo's motions and reject their answers.

## III.     Discussion

11.     On rehearing, Sierra Club argues that the Commission erred in the Remand Order by failing to: (1) consider issues that were not remanded by the court; (2) address Rio Grande's plans to incorporate carbon capture and sequestration (CCS) into the project; (3) properly consider air pollution and environmental justice impacts; (4) properly consider greenhouse gas (GHG) emissions impacts; (5) properly consider information concerning the Rio Bravo Pipeline Project; and (6) supplement its 2019 final environmental impact statement (Final EIS) based on new information concerning SpaceX.

### A.     Scope of the Remand

12.     Sierra Club asserts that once the Commission reacquired jurisdiction on remand, the Commission was not limited to only considering the two issues identified by the D.C. Circuit.[22] Sierra Club argues that the project and environmental context have changed since the Commission's prior approval and thus on remand the Commission should

---

[19] Remand Order, 183 FERC ¶ 61,046 at P 208.

[20] *Id.*

[21] 18 C.F.R. § 385.713(d)(1) (2022); 18 § 385.213(a)(2) (2022).

[22] *See* Rehearing Request at 6-9.

consider a broader range of issues[23] and that the Commission had discretion to reconsider the whole of its original decision once it reacquired jurisdiction.[24]  Finally, Sierra Club states that, to the extent that the Commission sought new information regarding air quality impacts to environmental justice communities, the Commission should have provided the public a meaningful opportunity to review and comment on that new information.[25]

13.    On remand, the Commission is under no legal obligation here to revisit any portion of its original decision other than those issues that are subject to the court's mandate.  To the contrary, as explained in the Remand Order, the Commission may reject arguments outside the scope of the remand.[26]  Sierra Club's citation to *Michigan Gas* is thus inapposite because, while that case recognizes the Commission's *discretion* to consider a broader range of issues on remand, its holding does not *compel* Commission action outside the scope of a court's remand.[27]  The Commission reasonably limited its analysis to the two issues subject to the court's remand—whether the social cost of GHG or similar protocol should be used and the scope of the Commission's environmental justice analysis.[28]

14.    To the extent that the Commission considered new information that bore upon the two issues that were subject to the court's remand, the public had a meaningful opportunity to review and comment on such information.  As noted above, on September 30, 2022, Commission staff issued a notice seeking public comments on Rio Grande's and Rio Bravo's responses to Commission staff's information requests.[29]  The

---

[23] *See id*. at 8-10 (referencing examples including various air pollution and environmental justice issues, and NEPA supplementation in the context of SpaceX).

[24] *Id.* at 9 (citing *Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998) (*Michigan Gas*)).

[25] *Id.* at 9.

[26] *See* Remand Order, 183 FERC ¶ 61,046 at P 88; *see also Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at P 9 (2018) (dismissing request for rehearing to the extent it presented arguments "beyond the remand scope" of the court's opinion).

[27] *See Michigan Gas*, 133 F.3d at 38 (stating only that the Commission has "the *discretion* to reconsider the whole of its original decision" on remand) (emphasis added).

[28] Remand Order, 183 FERC ¶ 61,046 at P 88.

[29] Notice Seeking Public Comment, 87 Fed. Reg. at 60,669.

Commission received over 150 comments in response to this notice,[30] including from Sierra Club.[31] Sierra Club also filed other, unsolicited comments during the pendency of the remand.[32] The Commission reasonably concluded that the record was sufficient for the Commission to address the issues identified in the court's remand,[33] which, as discussed above, is committed to the Commission's discretion.[34] Further, we note that Sierra Club fails to cite any precedent supporting its contention that the Commission's actions on remand were deficient. Accordingly, we reject the argument that the public was not afforded an adequate opportunity to review and comment on the new information.

## B.     Carbon capture and sequestration facilities

15.     On November 17, 2021, Rio Grande submitted an application to amend its 2019 authorization to incorporate carbon capture and sequestration systems into the approved site and design of the Rio Grande LNG Terminal (CCS System Amendment). On December 2, 2022, the Commission staff issued a notice of intent to prepare an environmental assessment for the CCS System Amendment.[35] Although Commission staff anticipated issuing the EA in May 2023, the schedule has been suspended while Rio Grande develops responses to several data requests.[36] The Remand Order did not address the content of this application or the Commission's ongoing review.

16.     Sierra Club argues that before the Commission could reaffirm its approval of the Rio Grande LNG Terminal, the Commission was required first to consider Rio Grande's pending proposal for the CCS System Amendment. Sierra Club claims that the

---

[30] *See* Remand Order, 183 FERC ¶ 61,046 at P 85.

[31] *See* Sierra Club October 19, 2022 Comments.

[32] *See* Sierra Club March 17, 2023 Comments; Sierra Club October 19, 2022 Comments.

[33] Remand Order, 183 FERC ¶ 61,046 at P 85.

[34] *See Spire STL Pipeline LLC*, 181 FERC ¶ 61,232, at P 20 (2022) ("Agencies on remand, unless otherwise directed by the court, may proceed as needed to supplement the record and redress issues identified by the court.").

[35] *See* 87 Fed. Reg 75,248 (Dec. 8, 2022).

[36] *See* 88 Fed. Reg. 24, 407 (Apr. 20, 2023).

Commission is obligated to consider the amendment now because, under NEPA, it is an action connected to the proposals that are the subject of the remand proceeding.[37]

17.    Rio Grande's CCS System Amendment is beyond the scope of the Commission's remand proceeding.  As noted above, in the Remand Order the Commission reasonably limited its analysis to the two issues subject to the court's remand—whether the social cost of GHG or similar protocol should be used and the scope of the Commission's environmental justice analysis.  The Commission's focus was consistent with its obligations under the law.[38]  As Sierra Club's CCS argument is outside the limited scope of the remand, and since the Commission is evaluating the proposed CCS System Amendment in a separate, pending docket,[39] this argument is not properly before us and we reject it.

18.    Nevertheless, Sierra Club's argument also fails on the merits because the CCS System Amendment is not a connected action with the Rio Grande LNG Terminal.  "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration."[40]  "The purpose of this requirement is to prevent agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."[41]  The CEQ's regulations define connected

---

[37] Rehearing Request at 10-15.

[38] Remand Order, 183 FERC ¶ 61,046 at P 16.

[39] *See* Rio Grande LNG, LLC, Application, Docket No. CP22-17-000 (filed Nov. 17, 2021).  Commission staff published a notice soliciting comments from interested stakeholders on the Rio Grande's CCS System Amendment.  *See Rio Grande LNG, LLC; Notice of Application for Limited Amendment and Establishing Intervention Deadline*, 86 Fed. Reg. 68,659 (Dec. 3, 2021).  In that proceeding, Sierra Club raised several arguments including that:  (i) Rio Grande did not demonstrate a complete or viable proposal for CCS; (ii) even with CCS, LNG exportation is not a climate solution; (iii) CCS will have other negative impacts; and (iv) various process issues.  Sierra Club, Protest, Docket No. CP22-17-000 (filed Dec.20, 2021).  Those comments will be addressed in that proceeding, consistent with the Commission's obligations under the Administrative Procedure Act.

[40] *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

[41] *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (*Myersville*) (quoting *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)).

actions as those that: (i) "[a]utomatically trigger other actions that may require environmental impact statements;" (ii) "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or (iii) "[a]re interdependent parts of a larger action and depend on the larger action for their justification."[42]  The Rio Grande LNG Terminal and CCS System Amendment do not meet any of these criteria.

19.     As an initial matter, the Rio Grande LNG Terminal did not "automatically trigger" the CCS System Amendment, nor vice versa, because the Rio Grande LNG Terminal was proposed and authorized as not inconsistent with the public interest years before the CCS System Amendment was filed.  Additionally, the Commission's consideration of the Rio Grande LNG Terminal and the CCS System Amendment did not overlap.  The Commission completed a comprehensive analysis of the Rio Grande LNG Terminal between 2016 and 2019, culminating in the Final EIS and the Authorization Order.  The Commission issued its order authorizing the Rio Grande LNG Terminal on November 22, 2019, and an order on rehearing on January 23, 2020.  Rio Grande filed its CCS System Amendment in November 2021.  It is still pending environmental review.  As such, there is no "temporal overlap" between the two projects.[43]

20.     Finally, the Rio Grande LNG Terminal has "substantial independent utility."  In other words, it will serve a significant purpose even if the CCS System Amendment is not built.[44]  There is independent utility when a project "can stand alone without requiring construction of the other [projects] either in terms of the facilities required or of

---

[42] 40 C.F.R. § 1501.9(e)(1) (2022) (formerly 40 C.F.R. § 1508.25(a)(1) (2022)).

[43] *See Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022) (*Food & Water Watch*) (stating that when considering whether natural gas infrastructure projects are connected actions, courts consider "the projects' degree of physical and functional interdependence, and their temporal overlap") (internal citations omitted); *see also E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233, at P 32 (2022) (finding that the Commission was not required to consider a proposed project that "is not imminent") (citing *City of Bos. Delegation*, 897 F.3d 241, 252 (D.C. Cir. 2018) (finding the Commission did not impermissibly segment its environmental review of three upgrade projects on the same pipeline system where the Commission's review of the projects was not contemporaneous and where the projects had substantial independent utility)).

[44] *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) ("The proper question is whether one project will serve a significant purpose even if a second related project is not built.") (citations omitted); *see also City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 ("[W]e consider 'whether one project will serve a significant purpose even if a second related project is not built.'") (citation omitted).

profitability."[45]  The Commission's review and authorization of the Rio Grande LNG Terminal was a standalone primary action; the Commission found that the terminal would not be inconsistent with the public interest before the CCS System Amendment was ever filed.  The terminal has independent utility regardless of the outcome of the CCS System Amendment proceeding.  Put another way, the terminal could exist and operate without CCS technology ever being implemented.  The proposal to add CCS facilities is a later, secondary action[46] that Rio Grande asserts will further reduce those environmental impacts of the terminal which the Commission has found to be acceptable.[47]  For these reasons, the Commission is not required to evaluate these actions together as "connected actions" under NEPA.[48]

21.     Sierra Club's argument that the Commission must supplement the Rio Grande LNG Terminal's Final EIS to address significant new information about the CCS System Amendment, including an evaluation of alternatives that were not previously available, such as alternatives that would reduce greenhouse gas emissions,[49] is an unpersuasive repackaging of its "connected actions" argument.  Since the actions are not connected for the purpose of NEPA, and reasonably foreseeable environmental impacts that would

---

[45] *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 237 (5th Cir. 2007).

[46] *See, e.g.*, *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 37 (finding that a project amendment was not connected action); *Penn E. Pipeline Co.*, 171 FERC ¶ 61,229, at PP 17-18 (2020) (same); *Sabine Pass Liquefaction, LLC*,       144 FERC ¶ 61,099, at P 34 (2013) (same).

[47] Although Sierra Club is correct that CCS System Amendment will not proceed without the construction of the Rio Grande LNG Terminal, we are not persuaded by Sierra Club's claims that the Rio Grande LNG Terminal would not proceed without the CCS facilities.  Rehearing Request at 10-11, 14; *id.* at 11 n.14 (citing "Rio Grande LNG," https://www.next-decade.com/rio-grande-lng/ (last visited May 22, 2023); NextDecade Corporation, *Accelerating the Path to a Net-Zero Future* (August 2022), https://investors.next-decade.com/static-files/d4fb70e5-e639-4859-b2bc-a62be1cb5435).  As support, Sierra Club references statements made in emails and marketing materials by Rio Grande's parent company, NextDecade Corporation (NextDecade), but Sierra Club fails to cite to record evidence to demonstrate that the Rio Grande LNG Terminal cannot proceed without the CCS facilities.  *Minisink Residents for Envtl. Pres. & Safety*, 762 F.3d 97, 108 (D.C. Cir. 2014) (affirming the Commission's rejection of a pipeline company's PowerPoint presentation as "merely a marketing document").

[48] Staff is preparing an EA for the CCS System Amendment, which we will address at the appropriate time.

[49] Rehearing Request at 14-15, 33-35, 47-48.

potentially result from the CCS System Amendment will be considered in a separate NEPA document as part of that proceeding, the Commission is under no legal obligation to supplement the Final EIS on the already authorized LNG Terminal.

22.     Under CEQ's regulations,

> [a]gencies:
>
> (1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:
>
> (i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.[50]

First, the Commission's action on remand was to correct errors identified by the court. There are no substantial changes to the proposed action that are relevant to environmental concerns. The fact that there is a later application has no bearing on the authorization in this proceeding and does not amount to significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

23.     Moreover, Sierra Club's reliance on *Alaska Wilderness Recreation and Tourism Association v. Morrison*[51] is misplaced. In *Morrison*, the court required the agency to complete a supplemental EIS in light of significantly changed conditions, namely the cancellation of a long-term contract upon which the agency's chosen alternative depended.[52] Thus, the agency's action depended on a rationale that was undercut by a change in circumstances. By contrast, here, the Commission's rationale to authorize the Rio Grande LNG Terminal is not undercut by Rio Grande's filing of its CCS System Amendment application. To the contrary, the evaluation of alternatives in the Final EIS was not influenced by any assumption or determination about carbon capture and sequestration technology. The information in Rio Grande's filings for the CCS System Amendment is pending review and will be fully considered as part of that proceeding.

---

[50] 40 C.F.R. § 1502.9(d).

[51] 67 F.3d 723 (9th Cir. 1995) *(Morrison)*.

[52] *Morrison*, 67 F.3d at 728-30.

### C.    Air Quality and Environmental Justice

### 1.    Changes in Emissions Data

24.    Sierra Club argues that the Commission erred by using air pollution emission and modeling data in the Remand Order that differed from that in the Final EIS without explaining what factors caused the changes to the data or providing the public an opportunity to comment on it.[53]  For example, Sierra Club notes that Rio Grande reduced its estimate of direct terminal nitrogen oxides (NOx) emissions by 46% compared to the estimate in the Final EIS and disputes that the design change from six liquefaction trains to five could explain that reduction in emissions.[54]  Sierra Club also states that Rio Grande's NOx emissions estimate from marine vessels is significantly lower than that in the Final EIS, as are estimates of GHGs and other criteria pollutants, and that Rio Grande did not provide a reasoned explanation for the reductions.[55]

25.    We disagree that these revised estimates are unsupported.  The 2009 EPA document[56] used as the basis of Rio Grande's marine vessel NOx emission estimates reported in the Final EIS specifies a NOx emission factor for diesel-powered tug boats of 13.2 grams per kilowatt-hour (g/kWh), whereas the updated 2022 EPA document,[57] superseding the 2009 version and used as the basis of Rio Grande's revised emission estimates, specifies a NOx emission factor for harbor craft (including tug boats) Tier 4 engines of 1.3 g/kWh.  Given that the updates to Rio Grande's emissions estimates are based on updated EPA-estimated emission factors, we find that the revised estimates are properly supported.  Additionally, the emissions estimates provided by Rio Grande are consistent with potential emissions estimates included within Rio Grande LNG's updated

---

[53] Rehearing Request at 15-16.  As discussed above, we disagree that the public was not afforded an adequate opportunity to review and comment on the new information.  *See supra* P 14.

[54] *Id.* at 15.

[55] *Id.* at 15-16.

[56] EPA, *Current Methodologies in Preparing Mobile Source Port-Related Emission Inventories:  Final Report* (Apr. 2009), https://www.epa.gov/sites/default/files/2016-06/documents/2009-port-inventory-guidance.pdf.

[57] EPA, *Ports Emissions Inventory Guidance:  Methodologies for Estimating Port-Related and Goods Movement Mobile Source Emissions* (Apr. 2022), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1014J1S.pdf.

air quality permit, issued on November 13, 2020, by the Texas Commission on Environmental Quality.[58]

## 2. PM2.5 Estimates

26.     Sierra Club questions Rio Grande's reliance on baseline data from an air monitor located 28 kilometers from the terminal site rather than using a closer air monitor maintained by the Texas Commission on Environmental Quality in Isla Blanca.[59]  Sierra Club argues that if Rio Grande's analysis of the cumulative impact of its operating emissions were modified to use the higher concentrations of particulate matter with an aerodynamic diameter of less than 2.5 microns (PM2.5) recorded at the Isla Blanca monitor, this would show a potential violation of the annual and hourly National Ambient Air Quality Standards (NAAQS) for PM2.5.[60]  Sierra Club maintains that the Commission must incorporate data from the Isla Blanca monitor to fulfill the Commission's obligation under NEPA to "make use of reliable existing data and resources."[61]  Sierra Club states that the Isla Blanca monitor more accurately reflects the current PM2.5 concentrations near the project site and so more accurately discloses what the project's impacts will be on local air quality and the health and safety of nearby residents.[62]

27.     We find that the Isla Blanca monitor was appropriately excluded from the air quality analysis because it appears that the monitor did not have three years of data to calculate annual and 24-hour PM2.5 design values as contemplated by EPA and the Texas Commission on Environmental Quality (TCEQ).[63]  The EPA lists the Isla Blanca

---

[58] Tex. Comm'n on Envtl. Quality, TCEQ Records Online, https://records.tceq.texas.gov/cs/idcplg?IdcService=TCEQ_EXTERNAL_SEARCH_GET_FILE&dID=5888297&Rendition=Web.

[59] Rehearing Request at 16-17.

[60] *Id.* at 17-18.

[61] *Id.* at 18-19 (quoting 40 C.F.R. § 1502.23 (2022)).

[62] *Id.* at 19.

[63] *See* 40 C.F.R. Pt. 50, App. N, §§ 4.1-4.2 (stating that three years of valid data are required to produce a valid annual or 24-hour design value); EPA, Guidance for Ozone and Fine Particulate Matter Permit Modeling at 50 (Jul. 29, 2022), https://www.epa.gov/system/files/documents/2022-07/Guidance_for_O3_PM2.5_Permit_Modeling.pdf ("The PM2.5 design value for the annual averaging period is based on the 3-year average of the annual average PM2.5 concentrations, while the PM2.5 design value for the 24-hour averaging period is based

monitor as having a beginning or start date for valid design values of October 7, 2019,[64] which means that the monitor did not have three years of data at the time the analysis was completed.[65]  Therefore, we conclude that the use of the AQS monitor 48-061-0006 in Brownsville (Brownsville Monitor) for calculating PM2.5 concentrations was appropriate.  In addition, because the Brownsville Monitor is closer in proximity to environmental justice communities than the Isla Blanca monitor, we find that use of the Brownsville Monitor was adequately representative to identify impacts to potentially affected population centers.[66]

### 3.    Ozone

28.    Sierra Club claims that Rio Grande's November 1, 2022 supplemental response containing an updated ozone analysis is insufficient and thus the Commission erred by citing the supplemental response in the Remand Order.[67]  Sierra Club argues that the updated analysis is problematic because it is unclear whether it repeats flaws in the Final EIS.  Sierra Club claims that the final EIS improperly excluded cumulative emissions from Texas LNG and emissions from both terminals' marine vessel traffic.[68]

29.    Sierra Club's assertion that the ozone analysis in the Final EIS was flawed is contrary to the D.C. Circuit's judgment accompanying its *Vecinos* opinion in which the court explicitly held that "[the Commission] was aware of and adequately considered the

---

on the 3-year average of the annual 98th percentile 24-hour average PM2.5 concentrations."); TCEQ, Air Quality Modeling Guidelines at 46 (Nov. 2019), https://www.tceq.texas.gov/assets/public/permitting/air/Modeling/guidance/airquality-mod-guidelines6232.pdf (stating that PM2.5 modeling should use the most recent three-year average of 98th percentile data for a monitoring site).

[64] EPA, *Air Quality Design Values*, https://www.epa.gov/sites/default/files/2021-05/pm25_designvalues_2018_2020_final_05_24_21.xlsx.

[65] *See* EPA, Interactive Map of Air Quality Monitors, https://www.epa.gov/outdoor-air-quality-data/interactive-map-air-quality-monitors (last updated Aug. 22, 2023) (enabling public to view the location of the Brownsville Monitor and Isla Blanca monitor by searching on an interactive map); Rio Grande February 13, 2023 Response to Environmental Information Request (showing the environmental justice census blocks within 50 kilometers of the terminal)..

[66] *See id.* at 34-35.

[67] Rehearing Request at 19.

[68] *Id.*

cumulative ozone effects when it decided to approve the three terminal projects" and that "NEPA demands no more."[69]  Moreover, as reflected in the Remand Order, Rio Grande updated its ozone analysis in response to an information request from Commission staff to account for the current terminal design.[70]  The analysis submitted by Rio Grande states that it complies with EPA's current Modeled Emission Rates for Precursors guidance and associated databases and with guidance from the Texas Commission on Environmental Quality.[71]  Based upon staff's review, the Commission has no reason to doubt the asserted bases or the accuracy of the calculations provided by Rio Grande and their calculations fall below the NAAQS threshold for ozone.  In light of the court's prior approval of the Commission's ozone analysis, we decline to revisit this issue.

## 4.    Reliance on Significant Impact Level modeling

30.    Sierra Club states that if the Commission relied on Significant Impact Level (SIL)[72] modeling to determine either the area of impact or the significance of emissions

---

[69] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 2021 WL 3716769, at *1 (D.C. Cir. Aug. 3, 2021) (unpublished).

[70] Remand Order, 183 FERC ¶ 61,046 at P 150.

[71] *Id.*

[72] The NAAQS SILs are defined by EPA under its statutory authority.  The EPA has historically interpreted Clean Air Act section 165(a)(3) and associated regulations to mean that a source must have a "significant impact" on ambient air quality in order to cause or contribute to a violation of the NAAQs.  *See* 42 U.S.C. § 7475(a)(3).  Under this authority, EPA has established its SILs through its regulations and  EPA has issued various non-binding guidance documents.  *See* 40 C.F.R. § 51.165(b)(2) (stating that "[a] major source or major modification will be considered to cause or contribute to a violation of a national ambient air quality standard when such source or modification would, at a minimum, exceed the following significance levels at any locality that does not or would not meet the applicable national standard" and providing the "significance levels" for $NO_2$ (annual amount), $SO_2$ (3-hour averaging time, 24-hour averaging time & annual amount), $PM_{2.5}$ (24-hour averaging time & annual amount), $PM_{10}$ (24-hour averaging time & annual amount), CO (1-hour averaging time & 8-hour averaging time)); EPA, Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, (April 17, 2018), https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf.  SILs are stated as emissions concentrations.  Exceeding a SIL triggers additional analyses to include ambient conditions.  SILs are set conservatively to ensure protection of air quality.  We clarify that the Commission's conclusions regarding air quality are based on

from the Rio Grande LNG Terminal, then this is a misuse of this modeling.[73]  Sierra Club also states that "[i]nsofar as FERC relied on the claim that project contributions to pollution would be below significant impact levels, it is unclear whether FERC included all foreseeable sources of pollution attributable to the projects, rather than merely considering pollution from stationary sources regulated by the Clean Air Act."[74]

31.     As an initial matter, the referenced conclusion regarding SILs was in regard to pollution from stationary sources regulated under the Clean Air Act.  We also clarify that although the Remand Order noted the SIL-based radius of impact was 12.8 kilometers, that observation was only to give context for Commission staff's determination that a more conservative radius of 50 kilometers around the approved Rio Grande LNG Terminal site would be the appropriate unit of geographic analysis for assessing project impacts on environmental justice communities.[75]  Commission staff requested, and Rio Grande provided, a cumulative air model extending to a radius of 50 kilometers.[76]  The model provided by Rio Grande included direct emissions from the Rio Grande LNG Terminal, mobile ship emissions (LNG carrier, tugs, escort vessels), relevant regional monitoring ambient background data, and existing and proposed regional industrial major sources within 50 kilometers of the LNG terminal's fence line boundary.[77]  This model also included direct emissions from the authorized Texas LNG Terminal and the Texas LNG Terminal's associated vessel emissions.[78]

32.     The Commission acknowledged that the Rio Grande LNG Project would cumulatively add to existing background concentrations of criteria air pollutants within the regional airshed, but found that the total concentration of background plus worst-case modeled emissions from sources within the 50-kilometer radius, including emissions from both the Rio Grande LNG Terminal and Texas LNG Terminal, would remain under applicable NAAQS thresholds, which are meant to protect sensitive populations.[79]

---

the SILs contained in 40 C.F.R. § 51.165(b)(2).

[73]  Rehearing Request at 20-25.

[74]  *Id*. at 4.

[75]  Remand Order, 183 FERC ¶ 61,046 at P 118.

[76]  *Id.* PP 73-77.

[77]  *Id.* PP 137, 148.

[78]  *Id.*

[79]  *Id.* P 149.  Table 1 in P 149 demonstrates that the worst-case predicted

### 5.     Impacts from Air Pollution Below the NAAQS

33.     Sierra Club argues that the Commission cannot assume that if air pollution will not violate the NAAQS, then health impacts related to air pollution will be insignificant.[80] Sierra Club states that EPA has recognized that concentrations of PM2.5, ozone, NO2, and CO below the NAAQS can result in adverse health impacts.[81]  Sierra Club also notes that the EPA has explained in a guidance document that potential impacts below significance in the NEPA context can be "particularly disproportionate or particularly severe on minority and/or low-income communities."[82]  Sierra Club states that the Commission is obligated to determine whether factors specific to the identified environmental justice communities, like lack of access to healthcare, might increase the significance of the cumulative impact of emissions from multiple facilities on these communities, regardless of whether ambient air quality remains below the NAAQS.[83]

34.     The D.C. Circuit has affirmed the Commission's use of NAAQS as a comparative metric in its NEPA analyses.  In *Sabal Trail*, the court stated that "[the Commission] appropriately relied on [the U.S. Environmental Protection Agency's (EPA)] [NAAQS] as a standard of comparison for air-quality impacts," and "[b]y presenting the project's expected emissions levels and the NAAQS standards side-by-side, the EIS enabled decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard."[84]  The D.C. Circuit also made clear in *Sabal Trail* that the Commission's decision to use the NAAQS as a comparative metric is entitled to deference.[85]  Sierra Club neither explains why the holding in *Sabal Trail*

---

concentrations for CO, NO2, PM2.5, PM10, and SO2 will be below the NAAQS at all locations within 50 kilometers of the Texas LNG Project.

[80] Rehearing Request at 25.

[81] *Id.*

[82] *Id.* at 28 (citing EPA Guidance at 3.2.2).

[83] *Id.* at 28-29.

[84] *See Sierra Club v. FERC*, 867 F.3d 1357, 1370 n.7 (D.C. Cir. 2017) (*Sabal Trail*).

[85] *See id.* (citing *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (stating that an agency's "choice among reasonable analytical methodologies is entitled to deference")); *see also Commonwealth LNG, LLC*, 183 FERC ¶ 61,173, at P 48 (2023) ("The Commission's comparison to the NAAQS, a generally-accepted standard established by EPA, for its analysis is entitled to deference.").

would not apply in this case, nor cites any authority for its assertion that NEPA's requirements cannot be satisfied by considering whether the projected criteria pollutant emissions are in compliance with the NAAQS. Thus, we continue to find that operation of the projects, when combined with the other projects within the cumulative geographic scope for air quality, would not cause or contribute to a potential exceedance of the NAAQS on a regional or localized basis and, as a result, environmental justice communities would not experience significant air quality impacts from criteria pollutants covered under the NAAQS during operation of the project.[86]

## 6.      Which Communities May Be Impacted by Air Emissions

35.      Sierra Club argues that the Commission fails to identify which environmental justice communities will experience emission impacts as a result of the project.[87] Sierra Club asserts that it is not sufficient to only identify the environmental justice communities within the Rio Grande LNG and Rio Bravo Pipeline projects' zone of impact, but that the Commission must also identify which of those environmental justice communities will be most affected due to an increase in concentrations of air emissions.[88]

36.      As a threshold matter, we note that the Commission, both in the original authorization[89] and on remand,[90] found the project's air quality impacts from criteria pollutants covered under the NAAQS to be less than significant.[91] We disagree that the Commission failed to identify which communities may experience air quality impacts as a result of the project.[92] As explained in the Remand Order, the Commission used a conservative 50-kilometer radius (approximately 31-mile radius) around the Rio Grande

---

[86] Remand Order, 183 FERC ¶ 61,046 at P 151.

[87] Rehearing Request at 29-30.

[88] *Id.*

[89] *See* Authorization Order, 169 FERC ¶ 61,131 at P 104 (citing Final EIS at ES13).

[90] *See* Remand Order, 183 FERC ¶ 61,046 at P 206.

[91] *See id.* P 151 ("The operation of the LNG terminal projects when combined with the other projects within the cumulative geographic scope for air quality would not cause or contribute to a potential exceedance of the NAAQS on a regional or localized basis, and therefore would not result in significant adverse air quality impacts on environmental justice communities in the region.") (citations omitted).

[92] *See id.* P 118, app. B.

Docket No. CP16-454-003, et al.                                                                        - 19 -

LNG and Rio Bravo Pipeline projects to identify the environmental justice communities that could potentially be subject to air quality impacts from the projects.[93] The Commission went on to recognize that because emissions from construction activities, like those associated with the projects, are variable and have a greater impact near the source, construction emissions would be highly localized and have the largest impact within a short radius around the construction footprint, but would disperse at further distances.[94] The Commission also recognized that construction emissions should not adversely affect any residences, the nearest of which are approximately 2.2 miles away, due to the degree of dispersion that would occur prior to any construction emissions reaching that distance.[95] The Commission specifically identified the Laguna Atascosa National Wildlife Refuge as the location within the 50-kilometer radius that may experience elevated construction impacts.[96] Accordingly, we find that the Commission sufficiently identified the specific environmental justice areas within the geographic area of review that may experience elevated air quality impacts due to the Rio Grande LNG Terminal and, therefore, reject Sierra Club's argument that anything more was required.[97]

## 7.   Mitigation and Monitoring Plan

37.    In the Remand Order, the Commission added a new Environmental Condition 144, which requires Rio Grande, prior to commissioning the project, to file with the Commission a Project Ambient Air Quality Mitigation and Monitoring Plan for particulate matter ($PM_{2.5}$ and $PM_{10}$) and nitrogen oxide ($NO_2$) for periods when construction, commissioning and start-up, and operation of the project occur simultaneously.[98] Sierra Club argues that the environmental condition is insufficient because it orders Rio Grande to produce a mitigation and monitoring plan in the future, and thus the effectiveness of such a plan could not be evaluated prior to the Commission

---

[93] *Id*. PP 118, 165.

[94] *Id*. PP 139, 165.

[95] *Id*. P 139.  Air emissions typically disperse over distance due to operational factors and weather factors such as wind direction, temperature, and pressure.

[96] *Id.*

[97] We observe that other than a generalized reference to a sentence in a CEQ guidance document (with which the Commission followed, as evidenced by the discussion in this section), *see* Rehearing Request at 29 n.84, Sierra Club cites no judicial or Commission precedent for this heightened obligation it purports to impose on the Commission.

[98] Remand Order, 183 FERC ¶ 61,046 at app. A.

issuing the Remand Order.[99]  Sierra Club contends that this alleged ambiguity precluded the Commission from relying on the environmental condition to determine that air quality impacts would not be significant during periods of concurrent construction and operation of the project, whether the project is considered on its own or cumulatively with the Texas LNG Terminal.[100]  Sierra Club also asserts that the Commission must afford the public and the EPA an opportunity to comment on the plan.[101]

38.      Sierra Club's argument fails because it rests on the erroneous premise that the Commission is required to have a final mitigation plan in place before it is able to act. However, the courts have made clear that NEPA does not require the formulation of a specific mitigation plan, only that mitigation is discussed in "sufficient detail to ensure that environmental consequences have been fairly evaluated."[102]  "NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."[103]  We disagree with Sierra Club's unsupported assertion that the Commission must afford the public and the EPA an opportunity to comment on the plan.[104]  The Commission, like other agencies, is generally master of its own calendar and procedures."[105]

---

[99] Rehearing Request at 30-31.

[100] *Id.*

[101] *Id.* at 32-33.

[102] *Sierra Club v. FERC*, 38 F.4th 220, 233 (D.C. Cir. 2022) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) (*Methow Valley*)); *see also Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017) (recognizing that the role of NEPA analysis is primarily information-forcing, imposes only procedural requirements, and does not impose a duty on agencies to include "a detailed explanation of the specific measures which will be employed to mitigate the adverse impacts of a proposed action") (quoting *Methow Valley*, 490 U.S. at 353).

[103] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (citing *Methow Valley*, 490 U.S. at 353 & n.16).

[104] Rehearing Request at 32-33.

[105] *Stowers Oil and Gas Co.*, 27 FERC ¶ 61,001, at 61,001 (1984); *see id.* at 61,002 n.3 (collecting precedent); *see, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("[T]his Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments."); *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423

39.     We also note that, notwithstanding the fact that the findings on which the Commission based its decision to impose Environmental Condition 144 were made public years ago in the Final EIS and Authorization Order, Sierra Club never argued that a mitigation and monitoring plan was necessary to reduce air impacts during periods of overlapping construction and operational activities.[106]

---

U.S. 326, 333 (1976) ("[A] reviewing court may not ... dictat[e] to the agency the methods, procedures, and time dimension of the needed inquiry ...."); *Richmond Power & Light v. FERC*, 574 F.2d 610, 624 (D.C. Cir. 1978) ("Agencies have wide leeway in controlling their calendars ....") (citing *City of San Antonio v. CAB*, 374 F.2d 326, 329 (D.C. Cir. 1967)); *Superior Oil Co. v. FERC*, 563 F.2d 191, 201 (5th Cir. 1977) (deferring to an agency's choice of procedures and allocation of resources because "[t]he Commission should 'realistically tailor the proceedings to fit the issues before it'") (quoting *Mobil Oil Corp. v. Fed. Power Comm'n*, 483 F.2d 1238, 1252 (D.C. Cir. 1973) (quotation marks omitted)); *Bell Tel. Co. v. FCC*, 503 F.2d 1250, 1266 (3d Cir. 1974) ("[T]he ultimate choice of procedure ... is left to the discretion of the agency involved, and will be reversed only for an abuse of discretion.").

[106] The Commission's conclusion that precipitated its imposition of Environmental Condition 144—that Commission staff could not exclude the possibility of short-term ambient emission concentrations of PM2.5, PM10, and NO2 at levels above the NAAQS during periods of overlapping construction and operational emissions —is not new as of the Remand Order.  To the contrary, Commission staff recognized in the Final EIS that "concurrent emissions from staged construction, commissioning and start-up, and operations of the LNG Terminal would temporarily impact local air quality and could result in exceedances of the NAAQS in the immediate vicinity of the LNG Terminal during these construction years," Final EIS at 5-15.  Commission staff nonetheless concluded that through use of mitigation measures during construction activities and application of best available control technologies, there would be no regionally significant impacts on air quality. *Id.* at 5-16.  The Commission adopted these conclusions in the Authorization Order, finding that intermittent exceedances of the NAAQS during overlapping periods of construction and commissioning and/or operational activities, if any (the Commission has not affirmatively concluded that there would be such exceedances), would not be persistent and, accordingly, would not result in regionally significant impacts.  *See* Authorization Order, 169 FERC ¶ 61,131 at PP 103-104.

## 8.     **Supplemental EIS**

40.     Sierra Club advances several arguments in support of its contention that the Commission was required on remand to prepare a supplemental NEPA document for its updated environmental justice analysis, all of which are unavailing.

41.     In *Marsh v. Oregon Natural Resources Council*, the Supreme Court explained that an agency's decision to prepare a supplemental EIS is governed by a "rule of reason" and that an agency need not supplement an EIS every time new information comes to light after an EIS is finalized, for to do so "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[107]  The D.C. Circuit has similarly made clear that a supplemental EIS "must only be prepared where new information provides a *seriously* different picture of the environmental landscape."[108]  An agency's determination of whether a supplemental EIS is needed "implicates substantial agency expertise" and is thus governed by the arbitrary and capricious standard and is entitled to deference.[109]

42.     Here, the Commission was not required to prepare a supplemental EIS because none of the circumstances to do so under 40 C.F.R. § 1502.9(d) are applicable.  In these circumstances, where we have found that there would be no significant impacts on air quality, we believe this is sufficient to demonstrate that section 1502.9(d) does not require a supplemental EIS.[110]  Moreover, the Commission's decision to not prepare a supplemental NEPA document did not preclude Sierra Club from commenting on Rio Grande's responses to the information requests.[111]  As a party to the docket, Sierra Club

---

[107] 490 U.S. at 373-74; *see also Mayo v. Reynolds*, 875 F.3d at 16.  As we explain above, the standard for the preparation of a supplemental EIS is set forth in CEQ's regulations.  *See* 40 C.F.R. § 1502.9(d).

[108] *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017)) (internal quotation marks omitted)).

[109] *Marsh*, 490 U.S. at 375-77; *see also Friends of Capital Crescent Trail*, 877 F.3d at 1059 ("If an agency's decision not to prepare a [Supplemental EIS] turns on a factual dispute the resolution of which implicated substantial agency expertise, the court defers to the agency's judgment.") (quoting *Marsh*, 490 U.S. at 376) (internal quotation marks omitted).

[110] *See* 40 C.F.R. § 1502.9(d) ("Agencies shall prepare supplements … if … there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

[111] Sierra Club asserts that NEPA required the Commission to solicit public

was on notice of the information when it was filed and could have provided comment on it at any time.[112] Indeed, Sierra Club has previously submitted comments in this docket when comment was not expressly sought.[113] For the reasons stated above, a supplemental EIS was not required.

43. Sierra Club next argues that the Commission's finding in the Remand Order that that certain impacts from construction and operation of the project would be disproportionately high and adverse because they would be predominantly borne by environmental justice communities[114] necessitates preparation of a supplemental EIS because, in the Final EIS, Commission staff concluded that there was no evidence environmental justice communities would be disproportionately affected by the project.[115] This argument fails because it distorts the standard for when a supplemental EIS is required. As discussed above, a supplemental EIS is required only on the basis described in 40 C.F.R. § 1502.9(d). The fact that the Commission found that certain impacts would be predominately borne by environmental justice communities does not require a supplemental EIS.

44. Sierra Club contends that the 367 new environmental justice communities identified by the Commission during the remand proceeding lacked the ability to

---

comment on information provided in response to an environmental information request issued on January 6, 2023. *See* Rehearing Request at 35 (citing Remand Order, 183 FERC ¶ 61,046 at P 137) (discussing Environmental Information Request for Rio Grande LNG Project, Docket No. CP16-454-000 (issued Jan. 6, 2023) (January 6 EIR)). As discussed above, Sierra Club has not shown that it lacked notice of any information in the record or an opportunity to submit comments.

[112] *See Rio Grande LNG, LLC, Rio Bravo Pipeline Co.; Notice of Application*, 81 Fed. Reg. 33,519, 33,520 (May 26, 2016) (Notice of Application) ("A person obtaining party status will be placed on the service list maintained by the Secretary of the Commission and will receive copies of all documents filed by the applicant and by all other parties."); Notice of Application, 81 Fed. Reg. at 33,520 (stating that a person need not intervene in the proceeding to have comments considered).

[113] *See* Sierra Club October 19, 2022 Comments; Sierra Club March 31, 2021 Comments. As the D.C. Circuit has explained, "a commenter before the Commission who has ample time to comment on evidence before the deadline for rehearing is not deprived of a meaningful opportunity to challenge the evidence." *Myersville*, 783 F.3d, at 1327 (citing *Minisink*, 762 F.3d at 115).

[114] Remand Order, 183 FERC ¶ 61,046 at P 206.

[115] Rehearing Request at 36 (citing Final EIS at 4-237).

Docket No. CP16-454-003, et al.                                      - 24 -

participate in the proceeding but would have been able to participate if the Commission had prepared a supplemental NEPA document.[116]  Not so.  As stated above, any person may file comments on the docket, even if the person did not formally move to intervene in the proceeding pursuant to the Commission's Rules of Practice and Procedure.[117]  Moreover, Sierra Club does not offer any example of an individual or group that sought to participate in the proceeding but was unable to do so.  We, therefore, reject the argument that a supplemental NEPA document is required to facilitate public participation for the reasons stated above.

45.      Finally, Sierra Club reiterates its request for the Commission to hold public meetings and provide information in Spanish,[118] arguing that the Commission's declination to do so in the Remand Order ran afoul of its environmental justice mandate under Executive Order 12,898.[119]  We disagree and find that the Remand Order sufficiently discussed both issues;[120] accordingly, we summarily dismiss these arguments.[121]

---

[116] Rehearing Request at 36.

[117] *See* 18 C.F.R. § 385.214 (2022); *see also supra* P 14.

[118] As we noted in the Remand Order, Rio Grande provided materials regarding the project in both English and Spanish and Spanish-speaking representatives were present at both the public scoping and comment meetings held in Port Isabel.  Remand Order, 183 FERC ¶ 61,046 at n.195.  Additionally, the Commission continues to consider how we can provide greater accessibility to our processes for non-English speaking populations.  *Id.* P 85.

[119] Rehearing Request at 37-40; *see also* Sierra Club Oct. 19, 2022 Comments at 3-4.  Although the Commission is not one of the specified agencies in Executive Order 12898, *see Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 at § 6-604 ("Independent agencies are requested to comply with the provisions of this order."), the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance.  *See*  18 C.F.R. § 380.12(g) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC *Guidance Manual for Environmental Report Preparation*, at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[120] *See* Remand Order, 183 FERC ¶ 61,046 at P 85.

[121] *See, e.g.*, *Coal. Of MISO Transmission Customers v. FERC*, 45 F.4th 1004,

## 9.     **Revisiting the NGA**

46.     Sierra Club argues that the Commission failed to consider impacts to environmental justice communities as part of its public interest analysis under the NGA when the Commission reaffirmed the authorizations for the projects.[122]

47.     To revisit the Commission's environmental analysis under NEPA, as directed by the court in *Vecinos*, the Remand Order included a robust environmental justice analysis that builds upon Commission staff's environmental justice analysis in the Final EIS.  In the Remand Order, the Commission concluded that environmental justice communities may experience significant cumulative visual impacts, but that all other project-related impacts would be less than significant.[123]  More specifically, the Commission found that potentially significant cumulative visual impacts would occur when the project was viewed from the Laguna Atascosa National Wildlife Refuge or by passersby travelling on SH-48.[124]  The Commission recognized that Rio Grande would minimize visual impacts from lighting by implementing light reduction techniques.[125]  With this additional analysis, the Commission satisfied its NEPA responsibilities.  NEPA itself "does not mandate particular results, but simply prescribes the necessary process."[126]

48.     For a proposal under NGA section 7 like the Rio Bravo Pipeline, the Commission applies its Certificate Policy Statement.[127]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the

---

1023 (D.C. Cir. 2022) (stating that the Commission is not obligated on rehearing to repeat its responses to arguments that were already raised and addressed by the Commission in the underlying order); *ISO New England Inc.*, 179 FERC ¶ 61,186, at P 42 (2022) (summarily dismissing arguments raised on rehearing when they were raised and sufficiently addressed in the underlying order).

[122] Rehearing Request at 40-42.

[123] Remand Order, 183 FERC ¶ 61,046 at PP 206-207.

[124] *Id.* P 163.

[125] *Id.*

[126] *See Methow Valley*, 490 U.S. at 350 (If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") (citations omitted).

[127] Certificate Policy Statement, 88 FERC ¶ 61,227.

proposed project will serve the public interest. The Certificate Policy Statement explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

49.     Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by project facilities. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

50.     In applying the Certificate Policy Statement to this proceeding, the Commission explained in the Authorization Order that Rio Bravo executed a precedent agreement with RioGas Marketing, LLC for the full capacity of the pipeline for a 20-year term.[128] As the Commission has explained, a precedent agreement for 100% of a project's capacity is significant evidence of project need.[129] Under the Certificate Policy Statement, the Commission also considers the economic interests of affected landowners and surrounding communities.[130] The project was designed such that "[a]pproximately 66

---

[128] 169 FERC ¶ 61,131 at P 32.

[129] *See, e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148, at P 20 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 16 (2022) (explaining the Commission to gives "precedent agreements for the transportation of gas destined for export the same weight in determining need that it gives to other precedent agreements for transportation" in interstate commerce and stating that "Congressional direction and intent, as expressed in section 3 and various trade agreements, would be thwarted if the Commission did not credit such precedent agreements as evidence of need").

[130] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,749 (explaining that under the Certificate Policy Statement, "[t]he balancing of interests and benefits that will

percent of the pipeline right-of-way would be collocated with or adjacent or parallel to existing pipeline, roadway, railway, or utility rights-of-way."[131]  Based on the anticipated benefits from the project and the minimal adverse impacts, the Commission found that the project was consistent with the Certificate Policy Statement.[132]  None of the information analyzed and disclosed in the remand proceeding undermines this finding.

51.     The Commission explained in the Authorization Order that, based on its application of the Certificate Policy Statement and its environmental review, the Commission concluded that the public convenience and necessity require approval and certification of Rio Bravo's proposal under section 7 of the NGA.[133]  None of the information analyzed and disclosed in our environmental analysis on remand undermines this conclusion.  In the Remand Order, the Commission appropriately reaffirmed its conclusion that the Rio Bravo Pipeline Project, as amended, is required by the public convenience and necessity, as conditioned in the Authorization Order and as modified in the Remand Order.[134]  The Commission's balancing under the public convenience and necessity standard is consistent with the purpose of the NGA[135] and is therefore afforded deference.[136]

---

precede the environmental analysis will largely focus on economic interests such as the property rights of landowners"); *see also id*. at 61,748 (discussing the scope of interests of landowners and surrounding communities considered under the Certificate Policy Statement).

[131] Authorization Order, 169 FERC ¶ 61,131 at P 31.

[132] *Id.* P 32.

[133] *Id.*

[134] Remand Order, 183 FERC ¶ 61,046 at P 208.

[135] *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation") (*NAACP v. FPC*); *id*. (explaining that the principal purpose of the NGA is to "encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act including "conservation, environmental, and antitrust questions") (citation omitted).

[136] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.") (*Chevron*); *Cf.*

52.     For a proposal under NGA section 3 like the Rio Grande LNG Terminal, there is a presumption favoring authorization. The Authorization Order recognized that "an LNG proposal shall be authorized unless the proposal "will not be consistent with the public interest."[137] That an NGA section 3 proposal "shall" be authorized unless it "will not be consistent with the public interest,"[138] "sets out a general presumption favoring such authorization[s]."[139] Although NGA section 3(e) authorizes the Commission "to approve or deny an application,"[140] courts have explained that to overcome the favorable presumption in NGA section 3(a) there must be an "affirmative showing of inconsistency with the public interest."[141] Moreover, NGA section 3(c) provides that the exportation of gas to FTA nations "shall be deemed to be consistent with the public interest."[142] In granting the NGA section 3 authorization, the Commission recognized that the Department of Energy, "pursuant to its authority under NGA section 3, has authorized Rio Grande to export up to 1,318 Bcf per year of domestically-produced natural gas (equal to approximately 26.1 MTPA of LNG) to free trade nations from the proposed Rio Grande LNG Terminal."[143] In the Authorization Order, the Commission determined that

_____

*Myersville,* 783 F.3d, at 1308 ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission,' *Okla. Nat. Gas Co. v. Fed. Power Comm'n,* 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not 'substitute its judgment for that of the Commission,' *Nat'l Comm. for the New River v. FERC,* 373 F.3d 1323, 1327 (D.C. Cir. 2004).") (*Myersville*).

[137] Authorization Order, 169 FERC ¶ 61,131 at P 22 (citing 15 U.S.C. § 717b(a)).

[138] 15 U.S.C. § 717b(a).

[139] *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (*Alaska LNG*); *EarthReports v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016) (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017).

[140] 15 U.S.C. § 717b(e).

[141] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987)).

[142] 15 U.S.C. § 717b(c).

[143] Authorization Order, 169 FERC ¶ 61,131 at P 22 (citing *Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 3869 (2016)); *see also* Remand Order, 183 FERC ¶ 61,046 at P 5 n.11 ("In August 2016, Rio Grande received authorization from the Department of Energy, Office of Fossil Energy (DOE) to export the project's full capacity, which is equivalent to 1,318 billion cubic feet (Bcf) annually

the requested NGA section 3 authorization was not inconsistent with the public interest.[144]  None of the information analyzed and disclosed in our environmental analysis on remand undermines this conclusion.  In the Remand Order, the Commission appropriately reaffirmed its conclusion that the Rio Grande LNG Terminal is not inconsistent with the public interest, as conditioned in the Authorization Order and as modified in the Remand Order.[145]  The Commission's balancing under the public convenience and necessity standard is consistent with the purpose of the NGA[146] and is therefore afforded deference.[147]

---

(approximately 3.6 Bcf per day (Bcf/d)) equivalent of natural gas in the form of LNG to countries with which the United States has a Free Trade Agreement (FTA).  *Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 3869 (2016).  Assuming a gas density of 0.7 kg/m3, 3.6 Bcf/d is 26.1 MTPA, which is roughly equivalent to the authorized 27 MTPA. On February 10, 2020, DOE issued an order authorizing Rio Grande to export LNG to non-FTA nations, but with which the U.S. still permits such trade.  *Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 4492 (2020).").

[144] Remand Order, 183 FERC ¶ 61,046 at P 3 ("We reaffirm that the Rio Grande LNG Terminal is not inconsistent with the public interest under NGA section 3, and the Rio Bravo Pipeline Project, as amended, is required by the public convenience and necessity under NGA section 7, as conditioned in the Authorization Order and as modified herein.").

[145] Remand Order, 183 FERC ¶ 61,046 at P 208.

[146] *See NAACP v. FPC*, 425 U.S. at 669 (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation"); *id.* (explaining that the principal purpose of the NGA is to "encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act including "conservation, environmental, and antitrust questions") (citation omitted).

[147] *See Chevron*, 467 U.S. at 844 ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *Cf. Myersville*, 783 F.3d at 1308 ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission,' *Okla. Natural Gas Co. v. Fed. Power Comm'n*, 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not 'substitute its judgment for that of the Commission,' *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir.

## D.    **GHGs**

53.    Sierra Club argues that the Commission has the authority and obligation to consider GHG emissions as part of its public interest determination under the NGA, which, in Sierra Club's view, requires the Commission to consider the significance and impact of such GHG emissions under NEPA.[148]  This argument is not properly before us on rehearing as it is outside the scope of the court's remand.  With respect to GHGs, the court's remand was limited to the narrow question of "whether 40 C.F.R. § 1502.21(c) call[ed] for [the Commission] to apply the social cost of carbon protocol or some other analytical framework as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not."[149]  Regardless, this argument conflates the Commission's NGA and NEPA responsibilities, which are separate and distinct.[150] The Commission's balancing under the public interest standard[151] is consistent with the purpose of the NGA[152] and is therefore afforded deference.[153]  As the D.C. Circuit has

---

2004).").

[148] Rehearing Request at 42.

[149] *Vecinos*, 6 F.4th at 1330.

[150] *See Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 at P 37; *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148, at P 101 (2023).

[151] *See* Remand Order, 183 FERC ¶ 61,046 at P 208; *see also Alaska LNG,* 67 F.4th at 1188.

[152] *See NAACP v. FPC*, 425 U.S. at 669 (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation"); *id.* (explaining that the purpose of the NGA is to "encourage the orderly development of plentiful supplies of . . .  natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act including "conservation, environmental, and antitrust questions") (citation omitted).

[153] *See Chevron*, 467 U.S. at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *see also Myersville* , 783 F.3d at1308 ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission,' *Okla. Natural Gas Co. v. Fed. Power Comm'n,* 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not 'substitute its judgment for that of the Commission,' *Nat'l Comm. for the New River v. FERC,* 373 F.3d 1323, 1327 (D.C. Cir. 2004).").

explained, the NGA section 3 standard that a proposal "shall" be authorized unless it "will not be consistent with the public interest[,]"[154] "sets out a general presumption favoring such authorization[s]."[155] To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an "affirmative showing of inconsistency with the public interest."[156] The Commission explained that here the presumption was not overcome.[157] In conducting its public interest analysis under NGA section 3, the Commission is not required to characterize the project's estimated GHG emissions as significant or insignificant; no court has held to the contrary. NEPA is not a means of "mandating that agencies achieve particular substantive environmental results";[158] rather, it is a procedural statute that "prescribes the necessary process."[159]

54.     Sierra Club next argues that the Commission erred by declining to use the social cost of carbon tool to determine whether the project's estimated GHG emissions are

---

[154] 15 U.S.C. § 717b(a).

[155] *Alaska LNG*, 67 F.4th at 1188; *EarthReports v. FERC*, 828 F.3d at 953 (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't. of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203.

[156] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d at 1111).

[157] *See Alaska LNG*, 67 F.4th at 1188 ("The NGA 'sets out a general presumption favoring ... authorization.' *W. Va. Pub. Servs. Comm'n*, 681 F.2d at 856. FERC's approval of the Project easily comports with the NGA. The Commission expressly concluded the Project was in the public interest because it would have substantial economic and commercial benefits, and these benefits were not outweighed by the projected environmental impacts.").

[158] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[159] *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022); *see also Methow Valley*, 490 U.S. at 351 (1989) (explaining that "it would not have violated NEPA if the Forest Service, after complying with [NEPA's] procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15%, 50%, or even 100% of the mule deer herd" and also explaining that "[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action").

significant for the purpose of NEPA.[160]  Sierra Club also asserts that the Commission could use the Interim GHG Policy Statement to make a significance determination.[161]  The Interim GHG Policy Statement argument is outside the scope of the court's remand and the Interim GHG Policy Statement was converted to a draft by the Commission.

55.     Moreover, Sierra Club argues that the Commission should follow CEQ's 2016 guidance,[162] questions the Commission's conclusion that the social cost of GHGs is not appropriate for project-level review,[163] and asserts that because "FERC estimate[d] [the] social cost of greenhouse gases directly emitted as a result of the Rio Grande LNG and Rio Bravo projects at $6.6 billion . . . these emissions are plainly not something that can be shrugged off" and must be "weigh[ed] in the public interest calculus."[164]

56.     First, we note that CEQ's 2016 guidance does not impose legal requirements on the Commission.  Second, we disagree with Sierra Club's suggestion that the social cost of GHGs is appropriate for project level review.  Third, we deny Sierra Club's claim that we must use SCC or some other method for measuring GHG impacts as part of our NGA merits review.  Since we have already found that SCC has no utility in the NEPA determination of significance—and there is no other scientifically valid method enabling us to do so—we disagree with Sierra Club's claim that we are *obligated* to use SCC in the NGA review.

57.     For informational purposes, Commission staff estimated the social cost of GHGs associated with reasonably foreseeable emissions from the project.[165]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[166] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in

---

[160] Rehearing Request at 43-46.

[161] *Id*. at 46-47 (citing *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement)).

[162] *Id*. at 44-45.

[163] *Id*. at 45.

[164] *Id*.

[165] *See* Remand Order, 183 FERC ¶ 61,046 at PP 98-99.

[166] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099 at PP 35-37.

terms of their impact on global climate change.[167]   Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[168]   Nor are we aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[169]   The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.[170]   In fact, the D.C. Circuit recently affirmed the

---

[167] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022).   The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[168] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051, at P 37 (2022); *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, 2019 WL 847199, at 2 ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.   That is all that is required for NEPA purposes."); *EarthReports*, 828 F.3d at 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *see, e.g., LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 91.

[169] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023) ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

[170] *See, e.g.*, *Alaska LNG*, 67 F.4th at 1184 (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as:  (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis ... previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports*, 848 F.3d, at 956 (upholding the Commission's

Docket No. CP16-454-003, et al.                                                                                    - 34 -

Commission's decision to not analyze the Social Cost of Carbon in its NEPA analysis,[171] rejected the suggestion that it was required to do so, found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[172]

58.     To the extent there are statements in the environmental documents and Remand Order that the projects' contributions to GHG emissions globally contribute incrementally to future climate change impacts,[173] we clarify that this is assuming that the transported gas is not displacing equal- or higher-emitting sources.  As there currently are no accepted tools or methods for the Commission to use to determine significance, the Commission did not characterize these emissions as significant or insignificant,[174] nor do we do so on rehearing.   Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

59.     Further, Sierra Club states that "FERC failed to address whether 40 C.F.R. § 1502.21 (formerly § 1502.22) required FERC to use methods generally accepted in the scientific community, including the social cost of carbon, to evaluate greenhouse gas emissions."[175]  That is incorrect.  The Commission directly addressed this argument.[176]

---

decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper v. FERC*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (same).

[171] *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions.  It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

[172] *Id.*

[173] *See, e.g.*, Remand Order, 183 FERC ¶ 61,046 at P 101; Amendment EA at 46 ("Construction and operation of the Project Amendment would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts.").

[174] *See id.*

[175] Rehearing Request at 8.

[176] Remand Order, 183 FERC ¶ 61,046 at PP 91-92.  Moreover, it remains the case that there is a "lack of consensus about how to apply the social cost of carbon on a long time horizon," "the social cost of carbon places a dollar value on carbon emissions but

Document Accession #: 20231027-3047          Filed Date: 10/27/2023

Specifically, we explained that "although we are including the social cost of GHG figures for informational purposes, we find that because the social cost of GHGs tool was not developed for project level review and . . . does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the CEQ regulations does not require its use in this proceeding."[177]

60.     Sierra Club also argues that the Commission cannot satisfy its obligations under NEPA and the NGA by comparing direct project emissions to the United States' or Texas' inventories.[178]  This contention is also outside the scope of the issues considered on remand and is not properly before us on rehearing.  Regardless, it is also substantively erroneous as the D.C. Circuit has explicitly held that the Commission acts reasonably by comparing a project's emissions with nationwide and state inventories.[179]

61.     Finally, Sierra Club asserts that the Commission was required to consider whether to require the addition of CCS to the terminal as a way of mitigating GHG emissions.[180]  We disagree.  Not only is this argument outside the scope of the remand, but, as we explain above, the CCS System Amendment is a separate proposal that is under Commission review in a separate docket and has no bearing upon the issues considered in this order.  Again, NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."[181]  Accordingly, we reject this argument.

---

does not measure environmental impacts as such," and there is "no established criteria for translating these dollar values into an assessment of environmental impacts."  *Alaska LNG*, 67 F.4th at 1184.

[177] Remand Order, 183 FERC ¶ 61,046 at P 92.

[178] Rehearing Request at 34.

[179] *See Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions. . . .  [The Commission's] approach was reasonable and mirrors analysis we have previously upheld.").

[180] Rehearing Request at 47-48.

[181] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (citing *Methow Valley*, 490 U.S. at 353 & n.16).

### E.    Rio Bravo Amendment Project

62.    Sierra Club argues that the Commission erred by approving Rio Bravo's amendment application without supplementing its NEPA analysis to assess:  (1) upstream GHG emissions; and (2) the Valley Crossing Pipeline alternative.[182]  We disagree.

63.    Emissions upstream from the proposed project are not reasonably foreseeable. NEPA requires agencies to consider indirect effects or impacts only to the extent that they "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[183]  The courts have found that an impact is reasonably foreseeable if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."[184]

64.    The environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ's regulations.[185]  Although Sierra Club asserts that the gas will be produced in the Permian Basin and Eagle Ford Shale,[186] which together cut across a large section of Texas and New Mexico, the Commission has previously explained that record evidence indicating only the basin in which gas may be sourced is insufficient to provide the certainty required to make any resultant upstream emissions reasonably foreseeable for the purpose of NEPA.[187]  That natural gas production and transportation facilities are all components

---

[182] Rehearing Request at 48-55.

[183] 40 C.F.R. § 1508.1(g)(2) (2022); *see also Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148, at P 92 (2023).

[184] *See, e.g.*, *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (citations omitted); *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).

[185] *E.g.*, *Equitrans, L.P.*, 183 FERC ¶ 61,200, at P 42 (2023); *see, e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 93; *Cent. N.Y. Oil & Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); *see also Nat'l Fuel Gas Supply Corp.* , 164 FERC ¶ 61,084, at P 102 (2018);  *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 93 (collecting cases).

[186] Rehearing Request at 49.

[187] *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 94 (finding that record evidence indicating that gas would be sourced from the Marcellus Shale was insufficient

of the general supply chain required to bring domestic natural gas to market does not mean that the Commission's approval of a particular infrastructure project will cause additional gas production.[188]  Even knowing the identity of a producer of gas to be shipped on a pipeline and the general location of that producer's existing wells does not change that the number and location of any additional wells that might be induced would be a matter of speculation.[189]  Therefore, we find that upstream GHG emissions are not reasonably foreseeable.

65.     Under *Freeport*,[190] the Commission need not consider the effects of upstream production or downstream transportation, consumption, or combustion of exported gas because the Department of Energy's "independent decision to allow exports —a decision over which the Commission has no regulatory authority—breaks the NEPA causal chain and absolves the Commission of responsibility to include in its NEPA analysis considerations that it 'could not act on' and for which it cannot be 'the legally relevant cause.'"[191]  Here, because any upstream emissions would be related to volumes of natural gas for export, the Commission is not responsible for the analysis of these potential impacts.

66.     The environmental assessment examined three alternatives for the Amendment Project (Amendment Project EA), including a system alternative using the Valley Crossing Pipeline.[192]  As noted above, 40 C.F.R. § 1502.9(d) sets forth when a supplemental EIS is required.[193]As explained above, none of the circumstances listed under that regulation have occurred.  Sierra Club's submission does not demonstrate that

---

to render any resulting upstream emissions reasonably foreseeable).

[188] *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at P 157 (2017), *order on reh'g*, 164 FERC ¶ 61,084 (2018).

[189] *Id.* P 163.

[190] *Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) (*Freeport*).

[191] *Id.* at 48 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004)); *see also Alaska LNG*, 67 F.4th at 1185 ("FERC's lack of jurisdiction over export approval … means it has 'no NEPA obligation stemming from th[e] effects' of export-bound gas.") (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1372 (D.C. Cir. 2017)).

[192] Amendment Project EA at 48-49.

[193] *See* 40 C.F.R. § 1502.9(d) ("Agencies shall prepare supplements … if … there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[194] Nor does the amendment represent "substantial changes to the proposed action that are relevant to environmental concerns."[195] Therefore, a supplemental EIS is not required.

67.    We continue to find that the Valley Crossing Pipeline Alterative is not a feasible alternative to the Amendment Project. We preface our discussion by noting that where, as here, a federal agency is not the sponsor of a project, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project."[196] Moreover, courts have upheld federal agencies' use of applicants' project purpose and need in environmental documents and as the basis for evaluating alternatives.[197] When an agency is asked to consider a specific proposal, the needs and goals of the parties involved in the application should be taken into account.[198] Further, because the alternatives considered under NEPA are informed both by "the project sponsor's goals,"[199] as well as "the goals that Congress has set for the agency,"[200] *i.e.*, the goals set in enacting the NGA, the Commission's consideration of alternatives includes the no-action alternative and alternatives that achieve the purpose of the project. As noted in the Amendment Project EA, the purpose of the Rio Bravo Amendment Project is "to provide flexibility and

---

[194] *Id*. § 1502.9(d)(ii).

[195] *Id*. § 1502.9(d)(i).

[196] *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 197 (D.C. Cir. 1991) (*Citizens Against Burlington*)).

[197] *E.g.*, *City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d at 1506; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d at 199 (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process.").

[198] *Citizens Against Burlington*, 938 F.2d at 196.

[199] *Id.* at 196.

[200] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018) (finding the statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives).

efficiency in satisfying the requirements of the natural gas shipper supplying natural gas to the Rio Grande LNG Terminal."[201]

68.     Sierra Club states that the Valley Crossing Pipeline is a viable system alternative to the Rio Bravo's pipeline system, arguing that both pipelines originate in the Agua Dulce hub and pass directly through the Rio Grande LNG Terminal site, and that Rio Grande plans to receive commissioning gas from the Valley Crossing Pipeline.[202]  Sierra Club asserts that there is sufficient unused capacity in the Valley Crossing Pipeline to replace one of Rio Bravo's approved pipelines.[203]  Sierra Club contends, without supporting evidence, that due to existing shippers' low use of contracted capacity on the Valley Crossing Pipeline, they may be willing to relinquish their contracts.[204]

69.     The Commission adequately considered and rejected the Valley Crossing Pipeline Alternative because, as recognized in the Remand Order, the Valley Crossing Pipeline is fully subscribed by end users in Mexico and cannot provide Rio Bravo's required capacity on a firm basis.[205]  Additionally, as explained in the Remand Order, the Rio Bravo Pipeline is an approved dual pipeline system, and the Amendment Project is limited in scope and only involves a 6-inch diameter increase for Pipeline 1, and a 0.2-mile extension and operating pressure change for Pipeline 1 and Pipeline 2.[206]  The Valley Crossing Pipeline is fully subscribed by end users in Mexico and cannot provide Rio Bravo's required capacity on a firm basis.[207]

---

[201] Amendment Project EA at 2; Remand Order, 183 FERC ¶ 61,046 at P 70.

[202] Rehearing Request at 52.

[203] *Id*. at 55.

[204] *Id*.

[205] Remand Order, 183 FERC ¶ 61,046 at P 72.

[206] *Id.* P 72; Amendment Project EA at 49.

[207] *See* Amendment Project EA at 49 ("As explained in our April 2019 FEIS for the Rio Grande LNG and Rio Bravo Pipeline projects, the Valley Crossing Pipeline's volume is fully subscribed by end users in Mexico; this remains accurate. Any transportation service that could be obtained for the Project Amendment from the Valley Crossing Pipeline would be on an interruptible basis only.  As such, the Valley Crossing Pipeline cannot provide the entire required capacity or a portion of this capacity on a firm basis.  Therefore, we do not consider the Valley Crossing Pipeline to be a viable system alternative to the Project Amendment, and we did not analyze it further").

Docket No. CP16-454-003, et al.                                                    - 40 -

70.     Sierra Club notes that the Valley Crossing Pipeline had a planned expansion to accommodate capacity for the Annova LNG Brownsville Project (Annova Project).[208] Due to the cancellation of the Annova Project, Sierra Club argues that there could still be available capacity on or a planned expansion to the Valley Crossing Pipeline resulting in available new capacity.[209]  Sierra Club states that the Commission must require Rio Bravo to ask Valley Crossing Pipeline, LLC, which shares the common parent company, Enbridge, whether it plans to expand the Valley Crossing Pipeline.[210]

71.     We find that Sierra Club provides no evidence to demonstrate that, given the cancellation of the Annova Project, there has been any expansion of the Valley Crossing Pipeline resulting in available firm capacity.  Thus, as explained in the Remand Order and the Amendment Project EA, any transportation service that could be obtained on the Valley Crossing Pipeline to supply the Rio Grande LNG Terminal would be on an interruptible basis.[211]  Additionally, there is no evidence that Valley Crossing Pipeline, LLC, an entity not subject to our jurisdiction,[212] is either willing or able to modify its facilities in a way that would create enough additional firm capacity to eliminate the need for Rio Bravo's Pipeline 2.  Therefore, we continue to find that the Valley Crossing Pipeline is not a feasible alternative to the Amendment Project.[213]

72.     The Remand Order explained that the Commission "does not independently design systems for pipeline companies; rather, the Commission ensures that any proposed project it approves is or will be required by the public convenience and necessity."[214] Under NEPA, the "rule of reason governs both which alternatives the agency must

---

[208] Rehearing Request at 52.

[209] Id. at 52-53.

[210] Id. at 54.

[211] Remand Order, 183 FERC ¶ 61,046 at P 72; Amendment Project EA at 49.

[212] We also do not accept Sierra Club's position, as we understand it, that Rio Bravo was obligated under the Commission's Guidance Manual for Environmental Report Preparations to develop new business arrangements or to pursue an alternate project related to the Valley Crossing Pipeline.  Rehearing Request at 53-54 (citing Office of Energy Projects, Guidance Manual for Environmental Report Preparation at 4-136 (Feb. 2017)).  That guidance does not suggest such a requirement.

[213] Remand Order, 183 FERC ¶ 61,046 at P 72; Amendment Project EA at 49.

[214] Id. P 73.

discuss, and the extent to which it must discuss them."[215]  Sierra Club proposes a fundamentally different configuration that will result in less operational flexibility.  We conclude that Sierra Club's proposed alternative is disproportionate to the scale of the contemplated federal action and is inconsistent with NEPA's rule of reason.[216]

F.    **SpaceX**

73.    Sierra Club raises several arguments pertaining to SpaceX's launch operations, none of which are persuasive, and all of which are outside the scope of the remand.[217]  Sierra Club first argues that the Commission should have supplemented its NEPA analysis to evaluate the potential for cascading impacts from future failed SpaceX launches of the Starship Super Heavy rocket, including impacts caused by particulate matter and vibrations.[218]  It next contends that the Commission should evaluate the cumulative impacts of SpaceX's launches and the operation of the projects on environmental justice communities.[219]  Finally, Sierra Club asserts that the Commission should reconsider whether it is in the public interest to site an LNG facility in proximity to SpaceX's operations.[220]

74.    The Commission made clear in the Remand Order that the remand was limited to two issues—whether the social cost of GHG or similar protocol should be used and the scope of the Commission's environmental justice analysis—and that it would not consider issues outside the scope of the court's mandate.[221]  The arguments regarding SpaceX are, therefore, not properly raised in this rehearing proceeding and are rejected.

---

[215] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (citations & internal quotation marks omitted).

[216] *See, e.g.*, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("[I]nherent in NEPA and its implementing regulations is a 'rule of reason.'") (citation omitted); *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) ("The rule of reason governs [a court's] review of an agency's environmental analysis.") (citation omitted).

[217] *See* Rehearing Request at 55-61.

[218] *Id.* at 60.

[219] *Id.* at 60-61.

[220] *Id.* at 61.

[221] Remand Order, 183 FERC ¶ 61,046 at P 85.

75.     Moreover, as acknowledged by Sierra Club in its rehearing request,[222] the Authorization Order contains two conditions that require Rio Grande to develop and implement procedures to monitor and mitigate adverse impacts from SpaceX launches, including a requirement to reference any Federal Aviation Administration (FAA) launch guidance issued to the public.[223]  These conditions are generally applicable and thus apply to the Starship Super Heavy rocket with which Sierra Club expresses concern.  The conditions also impose ongoing compliance requirements for the duration of the authorization.  Sierra Club asserts that these conditions are not sufficiently protective,[224] yet offers no support for this claim, nor does it explain why such generally applicable conditions would not adequately address adverse impacts from future Starship Super Heavy rocket launches.  Assertions that are unsupported by evidence or explanation fall short of the specificity required on rehearing.[225]  Accordingly, we reject these arguments as outside the scope of the issues before us on rehearing.

---

[222] *See* Rehearing Request at 60.

[223] *See* Authorization Order, 169 FERC ¶ 61,130 at app., envtl. condition 46 ("Prior to initial site preparation, Rio Grande shall develop and implement procedures to monitor rocket launch activity and to position onsite construction crews and plant personnel in areas that are unlikely to be impacted by rocket debris of a failed launch during initial moments of rocket launch activity from the Brownsville SpaceX facility. Rio Grande's procedures for positioning of onsite construction crews and plant personnel shall include reference to any guidance from the FAA to the public regarding anticipated SpaceX launches."); *id.* app., envtl. condition 131 ("Prior to introduction of hazardous fluids, Rio Grande shall develop and implement procedures for plant personnel to monitor the rocket launches from the Brownsville SpaceX facility and take mitigative actions before and after a rocket launch failure to minimize the potential of release reaching offsite areas or resulting in cascading effects that could extend offsite or impact safe operations.").

[224] Rehearing Request at 60.

[225] *See, e.g.*, *ZEP Grand Prairie Wind, LLC*, 183 FERC ¶ 61,150, at P 10 (2023) (rejecting argument on rehearing for lack of specificity where the petitioner "offer[ed] only [a] conclusory assertion in support of its position); *Turlock Irrigation Dist.*, 140 FERC ¶ 61,207, at P 27 (2012) (finding an argument that was "nothing more than a bald assertion" as being waived for lack of specificity).  Although these cases interpret the rehearing provision of the Federal Power Act, *see* 16 U.S.C. § 825*l*(a), the rehearing provisions of the NGA and FPA are "substantially identical" and "to be interpreted consistently with each other." *Granholm ex rel. Mich. Dept. of Nat. Res. v. FERC*, 180 F.3d 278, 280 n.2 (D.C. Cir. 1999).

76.     In any event, the Commission was not required to conduct supplementary NEPA procedures to address the SpaceX information raised by Sierra Club on rehearing.  As stated above, an agency is not required to prepare a supplemental EIS every time new information comes to light, but rather only when the circumstances under 40 C.F.R. § 1502.9(d) occur.  The information in question here does not meet that standard, particularly given that the Commission previously considered the potential for future SpaceX launches and included environmental conditions in the authorization that are specifically tailored to such launches.[226]  We find that there are no "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[227]

<u>The Commission orders</u>:

        In response to Sierra Club's rehearing request, the Remand Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Chairman Phillips is concurring with a separate statement attached.
                        Commissioner Danly is concurring in the result with a separate statement to be issued at a later date.
                        Commissioner Clements is dissenting with a separate statement attached.
                        Commissioner Christie is concurring with a separate statement attached.

( S E A L )




                                        Debbie-Anne A. Reese,
                                        Deputy Secretary.

---

        [226] *See Marsh*, 490 U.S. at 373-74 (holding that an agency need not supplement an EIS every time new information comes to light because doing so "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made").

        [227] 40 C.F.R. § 1502.9(d)(1)(ii).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Rio Grande LNG, LLC                    Docket Nos.  CP16-454-006
Rio Bravo Pipeline Company, LLC                    CP16-455-003
                                       CP20-481-001

(Issued October 27, 2023)

PHILLIPS, Chairman, *concurring*:

1.    I write separately to underscore three points.  First, I am pleased that we are
finally issuing these rehearing orders.  Our action today will only strengthen the legal
durability of the authorizations we issued following the decision from the U.S. Court of
Appeals for the D.C. Circuit in *Vecinos para el Bienestar de la Comunidad Costera v.
FERC*.[1]

2.    Second, I recognize that Commissioner Danly is "concurring in the result" of this
order.  In my earlier statement in *Mankato Energy Center, LLC*, I outlined my view on
this issue.[2]  I stand by that position.

3.    Third, in my earlier statement in *Rio Grande LNG, LLC*, I explained that the
Commission satisfied the court's directions in *Vecinos* both by conducting a full
environmental justice examination using our current methods, which are consistent with
EPA and CEQ guidance, and by taking an unprecedented and bipartisan step to protect
environmental justice communities from potential concerns about the projects' effects on
air quality.[3]  I want to reaffirm that the Commission went beyond the requirements of the
remand and that we are making progress on the critically important issue of
environmental justice.

        For these reasons, I respectfully concur.

_____
Willie L. Phillips
Chairman

_____

[1] 6 F.4th 1321 (2021).

[2] 184 FERC ¶ 61,170 (Phillips, Comm'r, concurring) (2023).

[3] *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (Phillips, Comm'r, concurring)
(2023).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Rio Grande LNG, LLC                    Docket Nos.  CP16-454-006
Rio Bravo Pipeline Company, LLC                   CP16-455-003
                                                  CP20-481-001

(Issued Oct. 27, 2023)

CLEMENTS, Commissioner, *dissenting*:

1.    I dissent from today's Order[1] for the same reasons I dissented from the Remand Order.[2] In addition, and perhaps most fundamentally, I dissent because the Order flouts the D.C. Circuit court's directive in *Vecinos* to (1) explain whether the Council on Environmental Quality's (CEQ) regulation, 40 C.F.R. § 1502.21(c), required the Commission to use the Social Cost of Carbon (SCC) protocol to assess greenhouse gas (GHG) emissions; and (2) revisit the Commission's Natural Gas Act (NGA) public interest determinations after addressing the deficiencies the court identified in the Commission's analysis of environmental justice (EJ) and climate change impacts.[3]

2.    In particular, I agree with the rehearing petitioners[4] (collectively, Sierra Club) that the Commission was obligated to (1) prepare a supplemental environmental impact statement (EIS) for Rio Grande LNG, LLC's (Rio Grande) proposed liquified natural gas terminal project (Rio Grande LNG Terminal) and Rio Bravo Pipeline Company, LLC's (Rio Bravo) proposed pipeline project (Rio Bravo Pipeline Project) (jointly the Projects), and (2) provide a meaningful opportunity for public comment on the supplemental EIS, including mitigation measures. The Commission's failure to do so has left us with a fundamentally flawed record that cannot support a public interest determination for either project. Moreover, I disagree with the Order's conclusion that it is impossible for the Commission to determine the significance of the environmental impacts of the Projects'

---

[1] *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Order).

[2] *See Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Remand Order) (Clements, Comm'r, dissenting).

[3] *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329, 1331 (D.C. Cir. 2021) (*Vecinos*).

[4] On May 22, 2023, Vecinos para el Bienestar de la Comunidad Costera, Sierra Club, City of Port Isabel, and the Carrizo/Comecrudo Tribe of Texas filed a joint request for rehearing of the Remand Order (Rehearing Request).

GHG emissions.[5] The Commission's continued failure to grapple with the significance issue puts our orders in jeopardy upon judicial review, particularly this one. Finally, I object to language in the Order making it unclear—apparently deliberately—whether the Commission considered GHG emissions at all in its NGA public interest determinations, as it was legally required to do.[6] For these reasons, I would grant rehearing and find that the Rio Bravo Pipeline application, as amended,[7] is not in the public convenience and necessity and that the Rio Grande LNG Terminal is inconsistent with the public interest.

3.        Following the D.C. Circuit court's remand of the Commission's original authorization orders in *Vecinos*, the Commission conducted new analyses of the Projects' impacts on EJ communities, including air quality and visual impacts. Instead of issuing a supplemental EIS fully explaining these analyses and taking public comment on it, the Commission instead merely summarized the results in its Remand Order. This was an unlawful procedural shortcut that left the Commission with a fatally deficient administrative record.

4.        Under CEQ's regulations implementing the National Environmental Policy Act (NEPA),[8] which the Commission's own NEPA regulations compel us to follow,[9] a supplemental EIS is required when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[10] In my dissent from the Remand Order, I explained that the Commission's new analysis identifying *hundreds* of additional potentially affected EJ communities by itself constituted "significant new information" requiring a supplemental EIS.[11] This new information painted a "*seriously* different picture of the environmental landscape," which

---

[5] *See* Order, 185 FERC ¶ 61,080 at PP 57-58.

[6] *See id.* P 53.

[7] Given my conclusion that the Rio Bravo Pipeline project in its entirety cannot be found to be in the public convenience and necessity, by extension the proposed changes to the project cannot be found to be in the public convenience and necessity. The Commission should have prepared a supplemental EIS addressing the Rio Bravo Pipeline and the proposed revisions to the project together.

[8] 42 U.S.C. §§ 4321-4370j (2021).

[9] *See* 18 C.F.R. § 380.1 (2022).

[10] 40 C.F.R. § 1502.9(d)(1)(ii) (2022).

[11] Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at P 3).

necessitated a supplemental EIS under relevant case law.[12]  Moreover, the Commission found that the Rio Grande LNG Terminal may cause significant air quality impacts and would cause significant visual impacts on EJ communities and their individual members.[13]  This was another, independent reason that a supplemental EIS was required.[14]

5.      The impacts identified in the Commission's new analyses are particularly important because they would fall on EJ communities, which "experience disproportionate and adverse human health or environmental burdens."[15]  Members of these communities suffer from poorer health outcomes and have lower life expectancies than those in other communities.[16]  The causes of this include inequitable access to clean water, clean air, natural places, and resources for other basic human health and environmental needs.[17]  The cumulative effects of exposure to the disproportionate burdens placed on EJ communities, taken together with the adverse impacts identified in the Commission's new analyses, will further disadvantage these communities.  By failing to fully assess these impacts in a supplemental EIS reflecting input from affected EJ communities, the Commission contributes to a longstanding problem of "gaps in

---

[12] *See Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017)) (internal quotation marks omitted).

[13] *See* Remand Order, 183 FERC ¶ 61,046 at PP 141 (describing potential NAAQS violations from simultaneous construction, commissioning, start-up, and operations), 147 ("individuals from environmental justice communities fishing or otherwise recreating near the terminal may experience adverse air quality impacts"), and 163 (finding cumulative adverse visual impacts on individuals from EJ communities would be significant).  In contrast, the 2019 EIS found that "the Rio Grande LNG Project is not expected to contribute to cumulative disproportionate, adverse effects on minority and low-income residents in the area."  EIS at 4-469.  The air quality cumulative impacts section concluded that air pollutant emissions "would not be expected to result in a long-term impact on regional air quality" and said nothing about significant adverse effects on EJ communities or their individual members.  *See id.* at 4-478.

[14] *See* Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at P 4).

[15] Exec. Order No. 14096, 88 Fed. Reg. 25251, 25252 (Apr. 21, 2023).

[16] *Id.*

[17] *Id.*

Docket Nos. CP16-454-006, et al.                                                                                - 4 -

environmental and human health data … [that act as] a persistent and pernicious driver of environmental injustice."[18]

6.      The Remand Order asserts that the Rio Grande LNG Terminal would not have a significant impact on air quality—and that no supplemental EIS therefore is required—based on the unsupported assumption that the air monitoring and mitigation plan required by new Environmental Condition 144 would prevent the combined construction, commissioning, start-up, and operational emissions from causing an exceedance of the pertinent National Ambient Air Quality Standards (NAAQS).[19]  While the courts have generally held that mitigation measures can be used to justify a finding of no significant impact (FONSI), an agency "must explain *exactly* how the measures will mitigate the project's impact."[20]  Although the agency is not required to have a complete mitigation plan for a "mitigated FONSI," the measures must be "developed to a reasonable degree."[21]  Moreover, the agency must demonstrate the feasibility of the mitigation measures, rather than relying on cursory descriptions of them.[22]

7.      Environmental Condition 144 falls far short of these standards.  Indeed, the condition is nothing more than "a plan to have a plan," as Sierra Club aptly put it.[23]  The condition does not say how many or what type of monitors Rio Grande must have, how a NAAQS exceedance would be calculated, what mitigation measures Rio Grande must implement in response to a NAAQS exceedance or how quickly it must do so, or whether or how Rio Grande must share the results of its monitoring and analysis with federal and

---

[18] *Id.*

[19] Remand Order, 183 FERC ¶ 61,046 at PP 142-143.

[20] *LaFlamme v. FERC*, 852 F.2d 389, 399 (9th Cir. 1988) (emphasis added) (citing *Steamboaters v. FERC,* 759 F.2d 1382, 1394 (9th Cir. 1985); *Jones v. Gordon*, 792 F.2d 821, 829 (9th Cir. 1986)).

[21] *National Parks & Conservation Association v. Babbitt,* 241 F.3d 722, 734 (9th Cir. 2001) (citations omitted); *see also* CEQ, *Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact,* 76 Fed. Reg. 3843,3848 (Jan. 21, 2011) (CEQ Mitigation Guidance) (mitigation measures should be "clearly described" and "carefully specified in terms of measurable performance standards or expected results").

[22] *See O'Reilly v. U.S. Army Corps of Engineers,* 477 F.3d 225, 234 (5th Cir. 2007).

[23] Rehearing Request at 31.

state air quality regulators or the public.[24]  Worst of all, there is no explanation of whether it will even be feasible for Rio Grande to prevent a NAAQS exceedance.  For these reasons, the Commission cannot rely on Environmental Condition 144 to support its FONSI and therefore must prepare a supplemental EIS fully assessing significant air quality and other impacts, as well as mitigation measures to prevent or minimize those impacts.[25]

8.      The unfortunate fact is that the Commission cannot demonstrate that the air quality and visual impacts identified in the Remand Order are the only significant impacts EJ communities will suffer from the Projects.  The reason is simple:  the Commission did not effectively elicit the public comment that is foundational to a complete environmental review.  As I explained in my dissent from the Remand Order, members of the hundreds of newly identified EJ communities have no way of knowing they are within the Projects' potential impact zone, let alone knowledge of whether and how they might provide information to the Commission on what those specific impacts would be or how to mitigate them.[26]  The Commission's failure to give the public opportunity to comment on the new analyses in the Remand Order or on the "mitigated FONSI" included in that order appears to contravene CEQ's guidance.[27]  Although the Commission did provide an

---

[24] Environmental Condition 144 does require Rio Grande to file weekly reports with the Commission about exceedances.  Remand Order, 183 FERC ¶ 61,046 at app. A, P 144(c).  The Commission cannot reasonably assume that air quality regulators or members of the public would monitor the docket for this information without some form of affirmative notice from Rio Grande or the Commission.

[25] The cases cited in the Order at P 38 are readily distinguishable.  None address the requirements for a mitigated FONSI.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *Sierra Club v. FERC*, 38 F.4th 220, 233 (D.C. Cir. 2022); *Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991).  And none approved a cursory plan to develop unspecified mitigation measures in the future.

[26] Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at P 7).

[27] *See* CEQ Mitigation Guidance, 76 Fed. Reg. 3848 (explaining CEQ's regulations provide for public involvement in the development of a mitigated FONSI document) (citations omitted).  In defending the Commission's approach, the Order states that the Commission "is generally master of its own calendar and procedures."  Order, 185 FERC ¶ 61,080 at P 38.  Although that may be generally true, the Commission's regulations provide that it will comply with CEQ's NEPA regulations (18 C.F.R. § 380.1), and CEQ interprets its regulations to require specific procedures for a mitigated FONSI.  None of the cases that the Order cites address public involvement with respect to

opportunity for comment on the project sponsors' responses to certain of Commission staff's highly technical environmental information requests, there was no opportunity to comment on critical air modeling information used in the Commission's cumulative air impacts analysis because that information was submitted *after* the public comment period closed.[28]  The Order misses the mark in claiming that "any person may file comments on the docket."[29]  The ability to file comments in the docket is meaningless, where, as here, potentially impacted communities have no actual notice of their ability to file.  To assure meaningful public participation, the Commission should have had an affirmative outreach program for potentially affected communities that included notifications in both English and Spanish.[30]

9.      I also dissent with respect to the Order's claim that the Commission is incapable of determining the significance of GHG emissions associated with the Projects.  The Order's insistence that there are no acceptable tools for determining the significance of GHG emissions remains unsupported, and gains nothing through reflexive repetition in virtually every recent Commission order issued under sections 3 and 7 of the NGA.

10.     In my recent concurrence in *Transco,* I explained the history of the language in Paragraphs 57 and 58 of the Order,[31] which has come to be known as the "*Driftwood* compromise."[32]  In *Driftwood,* the majority adopted unheralded new language declaring

---

a mitigated FONSI.  *See* Order, 185 FERC ¶ 61,080 at P 38 n.105.

[28] *See* Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at P 11).

[29] Order, 185 FERC ¶ 61,080 at P 44.

[30] Despite the Projects' documented impact on majority Hispanic/Latino communities with limited English proficiency, the Commission declined to provide any materials in Spanish.  *See* Remand Order, 183 FERC ¶ 61,046 at PP 111, 119.  In Cameron County, 70 percent of residents speak Spanish at home and 33.5 percent of the Spanish speaking population speaks English less than very well.  In Port Isabel, the city closest to the LNG terminal, a majority of residents speaks Spanish at home and 27.1 percent speak English less than well.  *See* Rehearing Request at 39.  While Rio Grande did translate materials regarding the project and provided Spanish-speaking representatives at the public scoping and comments meeting, the Commission failed to do so.  *See* Remand Order, 183 FERC ¶ 61,046 at n.195; P 85.

[31] *See Transcon. Gas Pipe Line Co.,* 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3) (*Transco* concurrence).

[32] *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at P 1).

that there are no methods for assessing the significance of GHG emissions, and particularly criticized the SCC protocol.[33]  I have dissented from this language in *Driftwood* and subsequent orders for two reasons:  (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[34] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[35]  I dissent from the language in paragraphs 57 and 58 of the Order for the same reasons.

11.     More fundamentally, I dissent from the Order's discussion of GHGs because it fails to satisfy the court's direction in *Vecinos* to explain whether 40 C.F.R. § 1502.21(c) calls for the Commission to use the SCC protocol or some other analytical framework to assess GHGs and "if not, why not."[36]  Rather than providing a reasoned analysis of CEQ's regulation, the Order merely repeats the Commission's superficial arguments against use of the SCC protocol.[37]  In analyzing whether CEQ's regulation calls for use of

---

[33] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

[34] Docket No. PL21-3.

[35] *See Driftwood*, 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting at PP 2-3); *see also Port Arthur LNG Phase II, LLC,* 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Calcasieu Pass, LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Northern Natural Gas Company*, 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas Eastern Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.,* 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); Remand Order, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

[36] *Vecinos*, 6 F.4th at 1330.  Given the requirement under the Administrative Procedure Act that agencies provide a reasoned explanation for their decisions, Envtl. Def. Fund v. FERC, 2 F.4th 953, 968 (D.C. Cir. 2021), I understand that is what the court has asked the Commission to provide on remand.  The Order is long on pronouncements, but woefully short on *reasoning*.

[37] Order, 185 FERC ¶ 61,080 at PP 56-59.  To be sure, some courts have upheld the Commission's determination not to use the SCC protocol.  *See id.* at P 56 & n.170.  But the court in *Vecinos* distinguished some of those cases because they did not address

the SCC protocol, the obvious central question is what CEQ's own position is on the protocol's usefulness in NEPA analyses. The Commission needn't look far to discover that CEQ unambiguously supports use of the SCC protocol in NEPA reviews. CEQ's 2016 GHG Guidance identifies the SCC protocol as a "harmonized, interagency metric that can give decision makers and the public useful information for their NEPA review."[38] CEQ's new GHG guidance issued in 2023 similarly recommends using the protocol in NEPA reviews, making no distinction between project-level analyses and agency rulemakings.[39] The Order simply misses the point in stating CEQ's 2016 guidance "does not impose legal requirements on the Commission."[40] The question posed on remand is whether CEQ's regulation should be interpreted to call for use of the SCC protocol in assessing GHG emissions. Based on CEQ's 2016 and 2023 guidance documents, the answer is "yes."

12.     I further object to language in paragraph 53 of the Order making unclear whether the Commission considered GHG emissions at all in its public interest determinations. Sierra Club asserts that the Commission has the authority and obligation to consider GHG emissions as part of its public interest determination under the NGA, including their significance and environmental impact.[41] As discussed below, the Order's response to this argument is deliberately vague and nearly unintelligible. Worse, the Order fails to provide a reasoned explanation of whether or how it "revisit[ed] its determinations of public interest and convenience under Sections 3 and 7 of the NGA,"[42] as the *Vecinos* court directed it to do. Rather than explaining whether and how the Commission factored its post-remand EJ and GHG analyses into its public interest determinations, the Order seems to suggest that environmental considerations may not be part of the Commission's

---

the CEQ regulation at issue here. *Vecinos,* 6 F.4th at 1329. The Sierra Club makes this very point, but the Order omits any mention of it, disregarding both the *Vecinos* decision and an important argument raised on rehearing. *See* Rehearing Request at 49.

[38] Council on Envt'l Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews at 33 n.86 (Aug. 1, 2016), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf.

[39] *See* Council on Envt'l Quality, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023).

[40] Order, 185 FERC ¶ 61,080 at P 56.

[41] Rehearing Request at 42.

[42] *Vecinos*, 6 F.4th at 1331.

Document Accession #: 20231027-3047   Filed Date: 10/27/2023

substantive public interest determination *at all.* It will likely come as quite a surprise to the court that the Commission may be using this order on rehearing to question decades of court and Commission precedents, as well as the Commission's own 1999 Certificate Policy Statement, finding that environmental considerations are an integral part of the Commission's public interest determinations under the NGA.

13.     In response to the Sierra Club, the Order says the Rehearing Request "conflates the Commission's NGA and NEPA responsibilities, which are separate and distinct. The Commission's balancing under the public interest standard is consistent with the purpose of the NGA and is therefore afforded deference."[43] The Order then cites the Supreme Court's decision in *NAACP v. Fed. Power Comm'n*,[44] and includes a parenthetical explaining that the Court said "the purpose of the NGA as [sic] to 'encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices' and also observing that there are subsidiary purposes to the Act including 'conservation, environmental, and antitrust questions.'" This leaves ambiguous whether the Commission's public interest determination focuses exclusively on "encouraging the development of natural gas supplies" or also encompasses environmental considerations, including the impacts of GHG emissions.

14.     The Commission used nearly identical language in its order in *Commonwealth LNG*,[45] prompting me to dissent.[46] If the Rorschach test could be translated into words, it might read like paragraph 53 of the Order. The Order's language is a verbal inkblot, with no fixed meaning. Its ambiguity leaves each of its authors free to say—outside the pesky confines of the Commission's actual order—*either* that the Commission does or does not consider GHG impacts in its public interest determinations. The Order appears to be deliberately propagating this ambiguity considering that (1) I criticized the vagueness of the language in my dissent in *Commonwealth LNG*, and (2) there is no other reason to include the language here because, according to the Order, Sierra Club's "argument is not properly before us on rehearing as it is outside the scope of the court's remand."[47]

15.     As I explained in my dissent in *Commonwealth LNG*, a reviewing court cannot discern from the inkblot language whether the Commission finds that it must consider

---

[43] Order, 185 FERC ¶ 61,080 at P 53.

[44] 425 U.S. 662, 669 (1976).

[45] *See Commonwealth LNG, LLC,* 183 FERC ¶ 61,173, at P 37 (2023) (*Commonwealth LNG*).

[46] *Id.* (Clements, Comm'r, dissenting, at PP 2-4).

[47] Order, 185 FERC ¶ 61,080 at P 53.

climate impacts and, if so, whether and how it weighs them in its public interest determinations.[48]  In failing to explain its reasoning, the Commission violates the most basic requirement of the Administrative Procedure Act.[49]  Additionally, in this case, it flouts the *Vecinos* court's direction to revisit the Commission's public interest determinations under the NGA after correcting the deficiencies in the Commission's original EJ and GHG analyses.

16.     To the extent the language in paragraph 53 of the Order is meant to suggest the Commission is not required to consider the environmental impacts of the project's GHG emissions in its public interest determinations under sections 3 and 7 of the NGA, it is plainly wrong and contravenes the Commission's 1999 Certificate Policy Statement,[50] as well as decades of court and Commission precedents.  The Commission's 1999 Certificate Policy Statement states that, in making its public interest determination under the NGA, "the Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, *the avoidance of unnecessary disruption of the environment*, and the unneeded exercise of eminent domain."[51]  The policy provides for the Commission to weigh project benefits against adverse consequences, including adverse environmental impacts.[52]  The Commission has clarified that, under this policy, it may deny a certificate under section 7 of the NGA if a proposed project's environmental harms outweigh its benefits.[53]

---

[48] *Commonwealth LNG,* 183 FERC ¶ 61,173 (Clements, Comm'r, dissenting, at P 2).

[49] *See, e.g., SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) ("[A]n agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.").

[50] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified,* 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (1999 Certificate Policy Statement).

[51] *Id.,* 88 FERC ¶ 61,227 at 2 (emphasis added).

[52] *See id*. at 18.

[53] Order Clarifying Statement of Policy, 90 FERC ¶ 61,128 at 17 ("[T]here may be cases in which service on an existing pipeline is an alternative to construction and the cumulative adverse impacts on an existing pipeline and its customers as well as on

17.     The courts have consistently agreed that the Natural Gas Act public interest standard encompasses environmental considerations.  More than sixty years ago, the Supreme Court held that our predecessor agency, the Federal Power Commission, properly factored air pollution impacts into its public interest determination under section 7 of the NGA.[54]  Nearly fifty years ago, in *NAACP*, the Supreme Court held that environmental protection is one purpose of the NGA.[55]  Over twenty years ago, courts continued to recognize that the NGA public interest determination involves weighing "market support, economic, operational, and competitive benefits, and environmental impact[s]."[56]  Finally, many recent decisions—including the D.C. Circuit's remand decision in *this* case—make clear that the Commission must consider the climate impacts of GHG emissions in its public interest determinations under the statute.[57]  If the

───────────────

landowners and the environment are significant enough that the balance would tip against certification.").

[54] *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 5 (1961).

[55] 425 U.S. at 669; Id. at 670 n.6.

[56] *See*, *e.g., South Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2000).

[57] *See Vecinos*, 6 F.4th at 1329, 1331 (finding Commission's analysis of climate change impacts deficient under *both* the NGA and NEPA and directing Commission to revisit its public interest determination after correcting deficiencies); *see also Cntr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (holding that the Commission makes an appropriate NGA public interest determination when it finds that a project has "substantial economic and commercial benefits" that are "not outweighed by the projected environmental impacts"); *Birckhead v. FERC,* 925 F.3d 510, 519 (D.C. Cir. 2019) (in addressing arguments relating to GHG emissions, the court explains that the Commission's public interest determination includes environmental considerations); *Sierra Club v. FERC,* 867 F.3d 1357, 1373 (D.C. Cir. 2017) (in addressing Commission's treatment of GHG emissions, the court explains that the balancing of factors in determining the public convenience and necessity includes environmental effects); *Sierra Club v. FERC*, 827 F.3d 36, 42 (D.C. Cir. 2016) ("As required by the Natural Gas Act and NEPA, the Commission undertook and extensive review of the Freeport Projects."); *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) ("The Section 7 certificate process incorporates review of proposed projects under the National Environmental Policy Act (NEPA)."  The court also noted that the NEPA review requires an analysis of downstream GHG emissions.); *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019) (holding that *"[a]s part of the Section 7 certificating process…* the Commission must complete an environmental review of the proposed project under the National Environmental Policy Act.") (emphasis added); *Minisink Residents for Env't*

Commission now intends to say that climate impacts (or any other environmental considerations) are no longer part of its public interest determination under the NGA, it must say so unambiguously and give a reasoned explanation for that conclusion.[58]

18.      NEPA also requires the Commission to consider climate and other environmental impacts in deciding whether to approve a project application.  As the Supreme Court has explained, NEPA's environmental impact statement requirement "ensures that the agency, *in reaching its decision*, will have available, and will carefully *consider*, detailed information concerning significant environmental impacts…."[59]  The Order's statement that the Commission's responsibilities under the NGA are "separate and distinct" from those under NEPA could be interpreted to suggest the statutes bear no relation to each other.[60]  To the contrary, the Commission's obligations under the two statutes are inextricably linked.  NEPA directs federal agencies "to the fullest extent possible" to interpret and administer their organic statutes in accordance with the environmental protection objectives set forth in NEPA.[61]  In requiring the Commission to consider environmental impacts in its substantive decision-making, NEPA gives content to the NGA's broad "public interest" standard.[62]

---

*Pres. & Safety v. FERC*, 762 F.3d 97, 106–11 (D.C. Cir. 2014) (stating that FERC is obligated to consider alternatives to a proposed project that might better serve the public interest, including on the basis of their environmental impact, when issuing a certificate under Section 7);  *Delaware Riverkeeper Network v. FERC*, 45 F.4th 104, 115 (D.C. Cir. 2022) ("[T]he Commission's balancing of public benefits and adverse consequences [in issuing a certificate] reasonably accounted for potential environmental impacts.").

[58] "[T]he requirement that an agency provide reasoned explanation for its action [under the Administrative Procedure Act] would ordinarily demand that it display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

[59] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (emphasis added).

[60] *See* Order, 185 FERC ¶ 61,080 at P 53.

[61] 42 U.S.C. § 4332; *see also* 42 U.S.C. § 4331 (setting forth NEPA's environmental protection objectives).

[62] *Cf. Village of Barrington v. Surface Transp. Bd*., 636 F.3d 650, 665-66 (D.C. Cir. 2011) (upholding agency's interpretation of "public interest" in its organic statute to include environmental considerations given NEPA's language and goals).

Document Accession #: 20231027-3047     Filed Date: 10/27/2023

19.     The best that can be said of the Order's attempt to divorce NEPA compliance from the Commission's substantive decision-making under the NGA is that it badly misconstrues both statutes.  But the Order's misguided language is even more indefensible here than it was in *Commonwealth LNG.*  The *Vecinos* court ordered the Commission to "reconsider its determinations of public interest and convenience under Sections 3 and 7 of the NGA, along with its NEPA analyses of the projects' impacts on climate change and environmental justice communities."[63]  By failing to clearly explain how, *or even if*, the Commission factored its post-remand environmental analyses into its NGA public interest determinations, the Commission failed to respond to the court's directive.  Of the many serious errors in this deeply flawed Order, that may be the greatest.

For the foregoing reasons, I respectfully dissent.

_____

Allison Clements
Commissioner

_____

[63] 6 F.4th at 1331.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| Rio Grande LNG, LLC | Docket Nos. | CP16-454-006 |
|---|---|---|
| Rio Bravo Pipeline Company, LLC | | CP16-455-003 |
| | | CP20-481-001 |

(Issued October 27, 2023)

CHRISTIE, Commissioner, *concurring*:

1.      While today's order correctly rejects Sierra Club's insistence that the Commission incorporate the "social cost of GHG" constructed numbers associated with the project into its public interest calculus under the NGA,[1] I would have preferred that the order reject this unsupportable claim more comprehensively.  I write separately to emphasize the following points.

2.      On remand, the court directed us either to use social cost of GHG, or some other "scientifically accepted" measurement, or to explain why we are declining to do so.[2]  The order correctly notes that, as the Commission has explained previously, the social cost of GHG construct is *not* useful for evaluating project-level emissions.[3]  But this barely scratches the surface of the problems with using this construct in our certificate proceedings.

3.      To begin with, a social cost of GHG calculation does not have the slightest scientific validity in any serious cost-benefit analysis of a natural gas infrastructure project, for a slew of reasons.  As just one example,  the social cost of GHG number is supposed to represent what economists call "negative externalities."  The typical social cost of GHG calculation, however, does not even bother to calculate a project's *positive* externalities and net them out, so the social cost of GHG number is utterly useless for its

---

[1] Order at PP 53 – 61.

[2] *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329-30 (D.C. Cir. 2021) (*Vecinos*) ("On remand, the Commission must explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol or some other analytical framework, as 'generally accepted in the scientific community' within the meaning of the regulation, and if not, why not.").

[3] Order at PP 56 – 59.

supposed purpose in weighing costs and benefits. Used as the project opponents want us to use it, the social cost of GHG calculation is pure pseudoscience.[4]

4.     The best that can be said about a social cost of GHG number in this context is that it is meaningless. Using such a meaningless number to attempt to gauge the global climate impact of a single project, would be literally an exercise of "garbage in, garbage out." Fortunately, the order makes clear both that the social cost of GHG calculation is not useful for ascertaining the global climate impacts of a single infrastructure project and that there is no other known method that would be scientifically valid for such purpose.[5] This Commission simply cannot make such a determination, and *no court has ever told us we must attempt the impossible.*

5.     And let's get real: The entire push, dating back to the failed attempt last year to enact the draft Certificate Policy and GHG Statements, has always had one overriding goal — a goal that is fully apparent from the insistence of the current CEQ and EPA that this Commission consider *both upstream and downstream non-jurisdictional* activities before approving any natural gas project.[6] That goal is to put in place a process and legal foundation for this Commission to *reject* needed natural gas projects solely on the basis of a single project's purported impacts on the global climate.[7] But as I said in my dissent

---

[4] One of the best definitions of "pseudoscience" is from the renowned 20th century philosopher Karl Popper, who said that, unlike true science, which seeks facts first before reaching logical conclusions, pseudoscience starts with preconceived conclusions and then selects (*viz.* "cherry picks") facts to fit its preconceived conclusions. *See, e.g.*, "Drawing the line between science and pseudo-science." Sternwedel, Janet D., *Scientific American Blog*, Oct. 4, 2011, https://blogs.scientificamerican.com/doing-good-science/drawing-the-line-between-science-and-pseudo-science/.

[5] Order at P 57. This is what has been called the "*Driftwood* language." It is worth observing that determining whether a proposed project is in the public convenience and necessity is not a question for the "scientific community"; it is a question for this Commission, acting pursuant to its lawful authority and in accordance with its good judgment.

[6] It is also flatly contrary to law. *See, e.g.*, *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) (*Freeport*) ("[W]here, as here, an agency 'has no ability to prevent a certain effect due to' that agency's 'limited statutory authority over the relevant action,' then that action 'cannot be considered a legally relevant "cause" of the effect' for NEPA purposes.") (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 771 (*Public Citizen*)) (cleaned up).

[7] *See Certification of New Interstate Natural Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Christie, Comm'r, dissenting at P 49 & n.97) (Christie Dissent) (identifying that the goal of many well-funded groups is to stymie development of natural gas

to the GHG Policy Statement, that would represent a radical rewrite of the Natural Gas Act (NGA), which neither this Commission nor the D. C. Circuit, nor any other appellate court, has the authority to do.[8]  Global climate change is far beyond this Commission's legal authority to regulate under the NGA.  Clearly global climate change and what to do about it from a regulatory standpoint are major questions of public policy — which, as the Supreme Court has recently reminded us, are the exclusive province of the legislature.[9]

6.      Finally, in response to Sierra Club's insistence that we also analyze the *upstream* GHG emissions caused by the project, today's order correctly reiterates that such upstream GHG emissions are not reasonably foreseeable.[10]  It is true, as the order says, that the record evidence does not support drawing the conclusion that upstream emissions are either caused by, or a natural consequence of, certificating this project.[11]  I would add, however, that, unlike with downstream emissions, the Commission has no legal obligation to estimate emissions from upstream, non-jurisdictional activities anyway, so this finding fulfills no legal obligation, and amounts to a "finding" of no legal consequence.[12]  Further, the Commission has no legal authority whatsoever to order

---

infrastructure), https://www.ferc.gov/news-events/news/items-c-1-and-c-2-commissioner-christies-dissent-certificate-policy-and-interim; *see also* Rich Glick and Matthew Christiansen, *FERC and Climate Change*, 40 ENERGY L.J. 1 (May 2019) ("Where climate change factors explicitly into the Commission's decision-making process, such as with respect to infrastructure permitting, the Commission *must thoroughly examine how its decision can affect the climate* in order to ensure that it is consistent with the public interest.  In these instances, the Commission cannot bury its head in the sand and ignore the climate change consequences of its decisions. . . .  [The Commission] *must consider an infrastructure project's implications for climate change* when evaluating whether that project is consistent with the public interest.  The urgent threat posed by climate change demands nothing less.") (emphases added).

[8] *See* Christie Dissent at PP 11-21.

[9] *See*, *e.g.*, *West Virginia v. EPA*, 597 U.S. ---, 142 S. Ct. 2587 (2022); *Biden v. Nebraska*, 600 U.S. ---, 143 S.Ct. 2355 (2023); *see also*, Christie Dissent at PP 22-40.

[10] Order at PP 63 – 65.

[11] *Id.* PP 64 – 65.

[12] The order correctly describes the limited "reasonably foreseeable" analysis under NGA section 3.  *Id*. P 65.  Although courts have told us to examine downstream emissions for NGA section 7 projects transporting natural gas in interstate commerce, they have not done so for NGA section 3 projects providing LNG for export.  *Compare Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*) with *Freeport*, 827

mitigation of such non-jurisdictional upstream activities, much less to consider such non-jurisdictional upstream emissions in our merits review under the NGA.

7.     To summarize, the order is sufficient as far as it goes to rebut Sierra Club's claims and to answer the D. C. Circuit's remand instructions, so I concur. The order does not go far enough, however, to make it absolutely clear that the NGA gives this Commission no legal authority to reject a natural gas project based on its purported impact on global climate,[13] regardless of whether that purported impact is packaged as a "social cost of GHG" number or in some other wrapper. Only Congress can decide the appropriate policy response to climate change and make amendments to the NGA. This Commission has no such legislative authority.

For these reasons, I respectfully concur.

---

F.3d 36. As I have previously observed, I believe the *Sabal Trail* court got it wrong. Christie Dissent at PP 42-48. I am in good company in questioning *Sabal Trail*. *See Ctr. For Biological Diversity v. U.S. Army Corp of Eng'rs*, 941 F.3d 1288, 1300 (11th Cir. 2019) ("[T]he legal analysis in *Sabal Trail* is questionable at best. It fails to take seriously the rule of reason announced in *Public Citizen* or to account for the untenable consequences of its decision. The *Sabal Trail* court narrowly focused on the reasonable foreseeability of the downstream effects, as understood colloquially, while breezing past other statutory limits and precedents — such as *Metropolitan* [*Edison Co. v. People Against Nuclear Energy*, 460 U.S. 776 (1983),] and *Public Citizen* — clarifying what effects are cognizable under NEPA.").

[13] Nor does this Commission have the authority under the NGA to reject a project based on its impacts on "environmental justice" or other communities as a result of the public-interest review under the NGA. *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (explaining that the Supreme Court "ha[s] consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare[,] [r]ather, the words take meaning from the purposes of the regulatory legislation"); *id*. (explaining that the purpose of the NGA is to "encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices" and also observing that there are subsidiary purposes to the Act) (citation omitted). While impacts on such communities should be fully and carefully considered and the mitigation of such impacts should be a focus of attention in the NEPA process, along with the mitigation of other environmental impacts, they are not the legal basis for a rejection under the NGA.

Docket Nos. CP16-454-006, et al.    - 5 -

Mark C. Christie
Commissioner