**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 23-1174(L), 23-1221

------

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

------

CITY OF PORT ISABEL, et al.,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

RIO BRAVO PIPELINE COMPANY, LLC, and
RIO GRANDE LNG, LCC,
*Respondent-Intervenors*.

------

On Petition for Review of Orders of the Federal Energy Regulatory Commission,
183 FERC ¶ 61,046 (Apr. 21, 2023) and 185 FERC ¶ 61,080 (Oct. 27, 2023)

------

**JOINT ANSWERING BRIEF FOR RESPONDENT-INTERVENORS**

------

Jeremy C. Marwell
Matthew X. Etchemendy
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
jmarwell@velaw.com

*Counsel for Respondent-Intervenor
Rio Bravo Pipeline Company, LLC*

Varu Chilakamarri
David L. Wochner
John Longsreth
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
varu.chilakamarri@klgates.com

*Counsel for Respondent-
Intervenor Rio Grande LNG, LLC*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenors Rio Grande LNG, LLC and Rio Bravo Pipeline Company, LLC submit this certificate as to parties, rulings, and related cases.

**1. Parties and *Amici*.** The parties who have appeared before the Court are listed in Petitioners' Circuit Rule 28(a)(1) certificate.

***Circuit Rule 26.1 Disclosures.*** Rio Grande LNG, LLC and Rio Bravo Pipeline Company, LLC, both filed Corporate Disclosure Statements on August 9, 2023.

**2. Rulings Under Review.** The Petitioners seek review of two orders of the Federal Energy Regulatory Commission ("FERC"): *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (April 21, 2023), R. 3011, JA ___; and *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (October 27, 2023), R. 3080, JA ___.

**3. Related Cases.** The related cases are listed in FERC's Circuit Rule 28(a)(1) certificate.

Date: February 12, 2024

Respectfully submitted,

*/s/ Jeremy C. Marwell*
*(by permission)*

*/s/ Varu Chilakamarri*

Jeremy C. Marwell
Matthew X. Etchemendy
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
jmarwell@velaw.com

Varu Chilakamarri
David L. Wochner
John Longstreth
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
varu.chilakamarri@klgates.com

*Counsel for Respondent-Intervenor*
*Rio Bravo Pipeline Company, LLC*

*Counsel for Respondent-*
*Intervenor Rio Grande LNG, LLC*

ii

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

Table of Contents.................................................................................. iii

Glossary ............................................................................................ix

Introduction.......................................................................................1

Statutes and Regulations.......................................................................2

Statement of the Case ..........................................................................3

Summary of Argument .........................................................................3

Argument ..........................................................................................5

I.    FERC reasonably decided not to prepare a supplemental EIS..................5

    A.    No supplemental EIS was required because the "new information" did not reveal seriously different environmental impacts. ..........................................................................5

    B.    FERC's process on remand enabled informed comment and decision-making. ...................................................................10

II.   FERC's environmental justice analysis reasonably responded to the Court's remand order................................................................14

    A.    FERC adequately explained its expanded environmental justice radius and reasonably assessed air impacts under that new radius. ...................................................................15

        1.    FERC's decision to use a 50-km radius is not properly before this Court, and in any event, is rational. ..............................15

        2.    FERC took the requisite hard look at air quality impacts on environmental justice communities. ....................................17

    B.    FERC's methodology for assessing air quality impacts was reasonable.......................................................................19

        1.    FERC's choice of air monitors is entitled to deference.......19

        2.    FERC adequately considered cumulative ozone impacts....21

III.  FERC's GHG analysis on remand was reasonable and consistent with *Vecinos*. ...........................................................................24

A.     FERC addressed and complied with § 1502.21(c). ......................24

B.     FERC Was Not Required to Determine Whether the Project's GHG Emissions Will Be "Significant" Via "Ad-Hoc" "Policy Judgment."....................................................................................28

C.     FERC Properly Addressed Public Interest and Public Convenience and Necessity. ...........................................31

IV.     Petitioners' CCS-related arguments are not properly before this Court. .................................................................................32

A.     Petitioners cannot re-litigate the EIS' choice of project alternatives. ....................................................33

B.     FERC reasonably chose to review the CCS proposal in a separate proceeding.................................................34

1.     FERC reasonably concluded that the CCS proposal did not constitute significant new information. ...............................35

2.     FERC reasonably concluded that the CCS Proposal is not a connected action. ............................................36

V.     If the Court grants any relief, it should remand without vacatur. ............39

Conclusion ....................................................................................40

Certificate of Compliance ..........................................................42

Certificate of Service ..................................................................43

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Canada v. DOT*,
148 F.3d 1142 (D.C. Cir. 1998)..........................................................25

*Alaska Wilderness Recreation and Tourism Association v. Morrison*,
67 F.3d 723 (9th Cir. 1995) ...............................................................35

*American Iron & Steel Institute v. EPA*,
115 F.3d 979 (D.C. Cir. 1997)............................................................17

*Canadian Ass'n of Petroleum Producers v. FERC*,
254 F.3d 289 (D.C. Cir. 2001)............................................................34

*City of Boston Delegation v. FERC*,
897 F.3d 241 (D.C. Cir. 2018)...........................................34, 36, 37, 38

*Coal. on Sensible Transp., Inc. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987)..............................................................38

*Communities Against Runway Expansion, Inc. v. FAA*,
355 F.3d 678 (D.C. 2004) .......................................................16, 17, 19

*Ctr. for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023).....................................................26, 28

*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014)..........................................................36

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021)..............................................................30

*Food & Water Watch v. FERC*,
28 F. 4th 277 (D.C. Cir. 2022)...........................................................16

*Friends of the River v. FERC*,
720 F.2d 93 (D.C. Cir. 1983)..............................................................12

*Gov't of Manitoba v. Bernhard*,
923 F.3d 173 (D.C. Cir. 2019).............................................................6

*Idaho Sporting Congress Inc. v. Alexander*,
  222 F. 3d 562 (9th Cir. 2000) ...............................................................7

*Illinois Commerce Com'n v. ICC*,
  848 F. 2d 1246 (D.C. Cir. 1988)...........................................................12

*Jicarilla Apache Nation v. DOI*,
  613 F.3d 1112 (D.C. Cir. 2010).............................................................24

*Marsh v. Oregon Natural Resources Council*,
  490 U.S. 360 (1989)..........................................................................6, 7, 8

*Mayo v. Reynolds*,
  875 F. 3d 11 (D.C. Cir. 2017).................................................................11

*Montana v. United States*,
  440 U.S. 147 (1979)...............................................................................21

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
  783 F.3d 1301 (D.C. Cir. 2015).............................................................36

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*,
  823 F.3d 641 (D.C. Cir. 2016)............................................................6, 7

*Nat'l Comm. for the New River v. FERC*,
  373 F.3d 1323 (D.C. Cir. 2004)...............................................................8

*NRDC v. U.S. Nuclear Reg. Comm'n*,
  879 F.3d 1202 (D.C. Cir. 2018)..............................................................12

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*,
  45 F.4th 291 (D.C. Cir. 2022)................................................................11

*Sierra Club v. EPA*,
  705 F. 3d 458 (D.C. Cir. 2013)...............................................................17

*Sierra Club v. FERC*,
  68 F.4th 630 (D.C. Cir. 2023), *vacated as moot by* 2023 WL
  5537562 (D.C. Cir. 2023) ........................................................................6

*Sierra Club v. FERC*,
  867 F. 3d 1357 (D.C. Cir. 2017)...........................................7, 15, 19, 21

*Stand Up for California! v. U.S. Dep't of Interior*,
    994 F. 3d 616 (D.C. Cir. 2021)............................................................6, 8, 34, 35

*Syverson v. International Business Machines Corp.*,
    472 F.3d 1072 (9th Cir. 2007) ...........................................................................33

*Taxpayers Watchdog, Inc. v. Stanley*,
    819 F. 2d 294 (D.C. Cir. 1987)..........................................................................38

*Vecinos Para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021)...................... 2, 5, 9, 14, 16, 28, 29, 31, 32, 33, 39

*Vecinos v. FERC*,
    No. 20-1045, 2021 WL 3716769 (D.C. Cir. 2021) .....................2, 21, 22, 23, 33

*Village of Bensenville v. FAA*,
    457 F.3d 52 (D.C. Cir. 2006)....................................................................... 20-21

## Statutes

15 U.S.C. 717 ..................................................................................................14, 16, 19

42 U.S.C. 4332 ...............................................................................................................30

National Environmental Policy Act,
    42 U.S.C. § 4321 et seq...... 3-6, 8-12,14, 19, 26-30, 34, 36, 38-39

## Regulations

18 C.F.R. § 380.7 ..........................................................................................................31

40 C.F.R. § 51 ...............................................................................................................16

40 C.F.R. § 1501.9 ........................................................................................................36

40 C.F.R. § 1501.12 ......................................................................................................22

40 C.F.R. § 1502.9 .....................................................................................................5, 7

40 C.F.R. § 1502.16 ................................................................................................16, 31

40 C.F.R. § 1502.21 ............................................... 3, 24, 25, 27, 28, 29, 30, 31

40 C.F.R. § 1502.22 ................................................................................................26, 27

40 C.F.R. § 1503.4 .................................................................6

40 C.F.R. § 1508.1 ...............................................................36

87 Fed. Reg. 60,669 (Oct. 6, 2022)......................................11

88 Fed. Reg. 1196 (Jan. 9, 2023) .........................................27

**Treatises**

18A C. Wright, A. Miller, & E. Cooper, Federal Practice and
      Procedure § 4434 (3d ed. 2023).........................................33

**Other Authorities**

*Promising Practices for EJ Methodologies in NEPA Reviews* (Mar.
      2016) ...........................................................................9, 17, 19

*Technical Support Document: Social Cost of Carbon, Methane, and
      Nitrous Oxide Interim Estimates under Executive Order 13990*
      (Feb. 2021), https://bit.ly/3rEJnyy....................................25

# <u>GLOSSARY</u>

| | |
|---|---|
| **Br.** | Petitioners' Opening Brief |
| **CEQ** | Council on Environmental Quality |
| **CCS** | Carbon capture system |
| **Commission** or **FERC** | Federal Energy Regulatory Commission |
| **Developers** | refers to Rio Grande and Rio Bravo, together |
| **EIS** | in the text refers to Environmental Impact Statement; in citations it refers to the Final Environmental Impact Statement, Rio Grande LNG Project (Apr. 2019) (R. 1277), JA ___ |
| **GHG** | greenhouse gas |
| **FERC Br.** | refers to the Commission's Response Brief |
| **LNG** | refers to liquefied natural gas |
| **NEPA** | National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* |
| **NAAQS** | National Ambient Air Quality Standards |
| **P** | refers to the internal paragraph number within a FERC Order or document |
| **Pipeline** | refers to the Rio Bravo Pipeline |
| **Project** | refers to the Pipeline and the Terminal, together |
| **R.** | refers to a record document by its Record Item Number, as listed on the amended Certified Index to the Record in this case (Doc. 2024262), filed October 27, 2023; |

| | |
|---|---|
| **Remand Order** | *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (April 21, 2023) (R. 3011), JA __ |
| **Rehearing Order** | *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (October 27, 2023) (R. 3080), JA ___ |
| **Rio Bravo** | refers to Respondent-Intervenor Rio Bravo Pipeline Company, LLC |
| **Rio Grande** | refers to Respondent-Intervenor Rio Grande LNG, LLC |
| **Terminal** | refers to the Rio Grande LNG Terminal. |

**INTRODUCTION**

This is the second challenge brought by the Sierra Club and others ("Petitioners") to forestall a liquefied natural gas project that the Respondent-Intervenors—Rio Grande LNG and Rio Bravo Pipeline Company—have been working to develop for over eight years, in concert with regulators and public stakeholders.  In 2019, FERC issued a 700-page Environmental Impact Statement ("EIS"), carefully considering project impacts and alternatives.  R.1277, JA __.  Later that year, FERC authorized the Project, subject to 143 environmental conditions.  R. 1314, JA __.

Petitioners challenged that authorization in this Court, raising a slew of claims, including that FERC failed to explore alternatives like a smaller terminal or lower-capacity pipeline system; failed to supplement the EIS when the developers reduced the number of liquefaction facilities; failed to take a hard look at impacts on ozone levels and environmental justice communities; failed to adequately explain using a two-mile-radius-of-review for environmental justice impacts; and failed to employ the "social cost of carbon" protocol to analyze greenhouse gas ("GHG") emissions.  Opening Brief, *Vecinos Para el Bienestar de la Comunidad Costera* ("*Vecinos*") *v. FERC*, No. 20-1045 (D.C. Cir.) (filed Sept. 23, 2020).

This Court rejected Petitioners' arguments in all respects, except for the latter two environmental-justice-radius and GHG issues, which it remanded for additional

1

explanation.  *Vecinos*, 6 F.4th 1321 (ordering limited remand); *Vecinos v. FERC*, No. 20-1045, 2021 WL 3716769 (D.C. Cir. Aug. 3, 2021) (otherwise denying petition).  The Court declined to vacate FERC's authorization, highlighting the disruptive consequences for the complex project and noting that it was "reasonably likely that on remand the Commission can redress its failure of explanation . . . while reaching the same result." *Vecinos*, 6 F.4th at 1332.  FERC did exactly that.  For over two years—through a public process in which Petitioners participated—FERC extensively engaged the remanded issues, reviewed updated data, and sought public input.  FERC ultimately expanded its environmental-justice-radius and determined that air-quality impacts to these communities remained insignificant.  FERC also explained why it need not employ the social cost of carbon protocol but nonetheless calculated and disclosed the relevant monetary estimates.  Nothing more was required.

Yet Petitioners now redouble their challenge—seeking to reopen settled issues; flyspecking others; and at times, criticizing FERC for doing on remand what Petitioners previously demanded that it do.  Petitioners' latest effort to block the Project lacks merit and should be rejected.

## STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the briefs of Petitioners and FERC.

2

## STATEMENT OF THE CASE

Intervenors adopt FERC's statement of the case.  *See* FERC Br. 6-28.

## SUMMARY OF ARGUMENT

I.     FERC's task on remand was narrow, and the additional information it received and reviewed revealed no seriously different environmental impacts than what FERC had already considered.  FERC's process was lawful and no supplemental EIS was required.  But even if it was, FERC's remand process invited robust public participation that otherwise satisfied the goals of the National Environmental Policy Act ("NEPA") 42 U.S.C. § 4321 et seq.

II.    As directed on remand, FERC reevaluated the geographic scope of its environmental justice review and chose a 50-km radius—tracking the Terminal's farthest-reaching potential impacts.  FERC appropriately reviewed the available air quality data; took the requisite hard look at air impacts on environmental justice communities; and explained that impacts would be insignificant but nonetheless "disproportionately high and adverse" insofar as those communities would predominately bear the impacts.  FERC then took the precautionary step of imposing a new—144th—environmental condition, requiring monitoring and mitigation of emissions immediately near the Project.

III.   FERC explained that 40 C.F.R. § 1502.21(c) did not require the use of the social cost of carbon protocol, which is not intended for use in project-level-

3

NEPA-review and provides no basis for making a "significance" determination for GHG emissions.  But even assuming otherwise, FERC discharged any duty by applying the protocol and disclosing the calculated dollar figures.  FERC reasonably rejected Petitioners' latest demand—beyond the remand's scope—that it exercise ad hoc policy judgment to make a significance determination. FERC's thorough review led it to reaffirm its public interest determinations.

IV.   FERC decided to separately review the developer's newly-proposed carbon capture system, reasonably concluding that the proposal was not a connected action or significant new information.  Petitioners' claim that this beneficial proposal requires reopening review of the entire Project is an improper attempt to halt the Project and is precluded by their previously-dismissed challenge to the EIS's alternatives assessment.

This Court should deny the petition.  But if further explanation were required, it should be obtained through remand without vacatur, given the remediable nature of the procedural claims and significant disruptive consequences of upending the longstanding authorizations.

## ARGUMENT[1]

### I.    FERC reasonably decided not to prepare a supplemental EIS.

Petitioners contend that FERC should have prepared a supplemental EIS before issuing its remand decision, and that they were prejudiced by the failure. Br. 23-39. This claim lacks merit. A supplemental EIS is required only when "new information" reveals that a project will have a seriously different environmental impact than was previously considered. Here, FERC reasonably determined that the new information it acquired on remand did not satisfy this threshold. Moreover, any alleged failure here was harmless, as FERC's process amply provided for informed public participation.

### A.    No supplemental EIS was required because the "new information" did not reveal seriously different environmental impacts.

Petitioners argue that a supplemental EIS was required because (1) *Vecinos* identified deficiencies in the NEPA analysis, and alternatively, (2) the updated air emissions data was significant new information, triggering supplementation under 40 C.F.R. § 1502.9(d)(1). Br. 23-29. Petitioners are wrong on both fronts.

*First*, while *Vecinos* remanded for FERC to further explain two issues, nothing in this Court's decision or NEPA required FERC to prepare a supplemental EIS. Notwithstanding Petitioners' assertion, there is no rule automatically requiring

---

[1] Intervenors incorporate FERC's statement of the standard of review. *See* FERC Br. 30-32.

a supplemental EIS any time an agency clarifies a NEPA analysis, even on remand. Outside of the limited circumstances where the regulations require supplementation, agencies retain discretion to correct explanations through a variety of procedures, and courts defer to an agency's reasonable approach. *See e.g., Sierra Club v. FERC*, 68 F.4th 630, 650-52 (D.C. Cir. 2023), *vacated as moot by* 2023 WL 5537562 (D.C. Cir. 2023) (criticizing FERC's explanation for not preparing supplemental EIS to address sedimentation impacts, but declining to vacate because FERC "could again conclude [on remand] that a new impact statement is unnecessary"); s*ee also Stand Up for California! v. U.S. Dep't of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (noting that agency can "buttress" analysis after draft EIS) (citing 40 C.F.R. § 1503.4(a) which permits modification of alternatives and analysis *after* public comment); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 383-85 (1989) (upholding agency's ability to assess new data through information reports).

Petitioners' cited cases do not support their sweeping proposition that all NEPA deficiencies require a particular kind of "NEPA process"; the cases instead stand as unremarkable examples of where agencies chose to supplement EISs based on the particulars involved, or where—unlike here—the court required a supplemental EIS on remand. *See* Br. 24-25 (citing *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 177 (D.C. Cir. 2019) (noting in background that agency issued a supplemental EIS post-remand); *Nat. Res. Def. Council v. U.S. Nuclear Regul.*

*Comm'n*, 823 F.3d 641, 644 (D.C. Cir. 2016) (similar); *Sierra Club v. FERC*, 867 F.3d 1357, 1362, 1375 (D.C. Cir. 2017) (directing preparation of new EIS on remand, given nature of the deficiencies); *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 564, 568 (9th Cir. 2000) (explaining that an agency could not address a "hard look" deficiency by simply producing information reports where agency had not—unlike here—reopened final decision)).  Rather than being an automatic requirement of every remand, the need for a supplemental EIS instead "turns on the value of the new information" that the agency considers on remand. *See Marsh*, 490 U.S. at 374.

*Next*, Petitioners argue that even if a supplemental EIS was not required by virtue of the remand alone, it was compelled by 40 C.F.R. § 1502.9(d)(1)(ii), which calls for supplementation when there are "significant new circumstances or information" bearing on the proposed action.  FERC determined that this standard was not met, because the new information did not reveal any seriously different impacts.  *See Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, PP146-151 (2023) (R. 3011) ("Remand Order"), JA __-__; 185 FERC ¶ 61,080, P21-23, 40-45 (2023) (R. 3080) ("Rehearing Order"), JA __, __.  Petitioners counter that the updated emissions data showed (1) a seriously different landscape insofar as impacts on a larger population were evaluated, and (2) a disproportionate and adverse effect on environmental justice communities.  Br. 28-29.

7

Petitioners wrongly characterize the new air quality data as presenting "a seriously different picture of the environmental landscape," Br. 29—language they borrow from case law with wholly different facts.  New data alone does not trigger a supplemental EIS.  *See, e.g., Friends of Capital Crescent Trail v. Federal Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) ("Over the course of a long-running project, new information will arise . . . NEPA does not require agencies to needlessly repeat their environmental impact analyses every time such information comes to light.").  Instead, the touchstone of the "new information" trigger is whether the information "paints a seriously different picture *of the impact* of the project." *Stand Up for California!*, 994 F.3d at 629 (cleaned up and emphasis added); *Friends of Capital Crescent Trail*, 877 F.3d at 1060-61 (supplemental EIS for the Purple Line was not triggered by new information showing ridership decline, because it did not adversely alter the project's "environmental impact in an absolute sense"); *see also Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1331 (D.C. Cir. 2004) (affirming decision not to supplement where developer's new river-crossing plan disclosed an "environmental impact" of conventional drilling that had "in effect, already been anticipated").  The focus on *impact* comports with *Marsh*'s instruction that the need for a supplemental EIS is functionally the same as for an original EIS—both are triggered by impacts.  490 U.S. at 374.

8

Here, the new air quality information did *not* paint a seriously different picture of Project impacts. As this Court noted, FERC previously understood that air quality impacts could occur within 50 km, *Vecinos*, 6 F.4th at 1330 (citing EIS 4-394 (R. 1277) JA ___), and FERC concluded that the Project with mitigation measures would not result in regionally significant impacts on air quality, EIS 5-15, JA___. This time, FERC assessed updated air emissions data for the same area and expanded its environmental justice data to match this 50-km radius. But doing so did not reveal a different landscape; it simply enabled FERC to apply a wider lens when analyzing the same landscape. That analysis revealed an unsurprising picture of air quality impacts that dissipate with distance—not a picture of new and significant impacts. Remand Order P146-151, JA ___-___ (reaffirming that air quality impacts would not be significant in light of updated data).

Petitioners also assert that, even though FERC ultimately deemed the air quality impacts "insignificant," a supplemental EIS was triggered by FERC's finding that these insignificant impacts are "disproportionate and adverse" as to environmental justice communities. The only authority Petitioners reference is a nonbinding EPA working group report, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016), which undermines Petitioners' argument. The report explains that a "disproportionately high and adverse impact" can have relevance for some contexts—such as further informing the agency's community engagement

9

efforts and mitigation and monitoring measures—while still not being "significant within the meaning of NEPA." *Id.* at 33, 38.  The report then confirms that the environmental justice executive order (EO 12898) "does not change the legal thresholds for NEPA, including whether . . . an Environmental Impact Statement should be prepared." *Id.* at 33, 38 ("the identification of a disproportionately high and adverse impact" does not "compel a conclusion that a proposed action is environmentally unsatisfactory").

While FERC used a more accurate label on remand to acknowledge the geographic reality that the Project disproportionately impacted environmental justice populations, the updated air data did not fundamentally alter FERC's prior understanding of the Project's actual air impacts, or which communities would be impacted.  *See* FERC's 2020 Rehearing Order P69, (R. 1349), JA ___ (providing FERC's prior view of impacts on environmental justice communities).  FERC reasonably decided that a supplemental EIS was unnecessary, and that judgment is entitled to deference, FERC Br. 31 (citing cases).

### B.    FERC's process on remand enabled informed comment and decision-making.

FERC's comprehensive remand process invited public participation and fell comfortably within the agency's discretion.  *Accord* FERC Br. 67.  Given that extensive process, even if this Court concluded that FERC should have prepared a supplemental EIS, any misstep on that front would be harmless.

10

This Court has long recognized that other public-participation opportunities in an agency's process can serve the same purpose as certain NEPA procedures. *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) (excusing agency's failure to comply with NEPA's scoping requirements where agency provided notice of its review and received comments in a manner that "accomplished the same objectives," resulting in no prejudice). The key question is whether NEPA's goals of "informed public comment and informed decisionmaking" were materially impeded by the use of an alternate process. *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017); *see also Oglala Sioux Tribe*, 45 F4th at 300. Here, FERC's process was appropriately tailored to advance NEPA's goals—particularly in the context of responding to a limited remand from this Court, which otherwise upheld FERC's years-long NEPA-EIS process. As relevant here, FERC:

- publicly requested information relating to the remand issues, and explicitly indicated that it was now considering expanding the "environmental justice radius" to 50 km. *See, e.g.,* Feb. 3, 2022 Request to Rio Grande at 1 & n.1, 3 (R. 2822), JA__ & __, __ (requesting sociodemographic data "for block groups within 50 kilometers of the RG LNG Terminal site" and updated air quality modeling "within 50 kilometers of the fenceline").

- issued a Federal Register notice, soliciting comments and replies on the data that the companies produced. 87 Fed. Reg. 60,669 (Oct. 6, 2022);

- received over 150 comments, including a detailed submission by Petitioners (filed by Sierra Club) raising concerns about air modeling and environmental justice communities, Oct. 19, 2022 Comments (R. 2926), JA __.

- issued its Remand Order, adopting its previously-forecasted 50-km environmental justice radius and responding to comments.

11

- provided a detailed response to Sierra Club's rehearing petition. Rehearing Order, JA __.

As a result, the public had notice of the specific issues FERC was reevaluating; notice of the new approach (the 50-km radius) being considered; an opportunity to review and comment on the data FERC would use under the new approach; and multiple opportunities to provide views *before* the final decision. This robust process exceeds others this Court has deemed acceptable, even where other agencies did not precisely comply with a NEPA procedure. *See, e.g., Friends of the River v. FERC*, 720 F.2d 93, 106-08 (D.C. Cir. 1983) (excusing agency failure to consider alternative in the EIS, where agency considered the issue in its rehearing order); *Illinois Commerce Com'n v. ICC*, 848 F. 2d 1246 (D.C. Cir. 1988) (excusing agency failure to conduct environmental assessment where it used other procedures to engage concerns before final action).[2]

Petitioners raise a litany of grievances about FERC's approach, but at bottom contend that the failure to produce a supplemental EIS prejudiced their ability to

---

[2] Petitioners cannot avoid the precedential effect of *Friends of the River* and its progeny, which did—*contra* Br. 36-37—consider the relevance and potential value of a public comment process. *See id.*, 720 F.2d at 106 n.27 (no remand, even where order "was not circulated for comment before the final decision was made"); *NRDC v. U.S. Nuclear Reg. Comm'n*, 879 F.3d 1202, 1211 (D.C. Cir. 2018) (no remand where agency "adequately augmented its decision . . . in a publicly accessible opinion").

submit comments and thus influence the decision-making process.  Br. 34-39.  The facts show otherwise—Petitioners had a meaningful opportunity to—and did—influence the decision-making process.

Petitioners were parties below, received notice of every filing, and could have provided comments "at any time."  Rehearing Order P42, JA __.  Moreover, FERC directly engaged Petitioners' submission throughout its Remand Order, including on various aspects of the remanded issues.  *See* Remand Order P90-92, 100, JA__ (GHG emissions); P110, JA__ (environmental justice impacts); P110, JA__ (mitigation); P114, JA__ (traffic impact on environmental justice communities); P136, JA__ (air modeling); P146, JA__ (environmental justice health impacts).  Petitioners had further opportunity on rehearing to respond to the Remand Order and explain their views.  Rehearing Request (R. 3021), JA __.  FERC's Rehearing Order addressed Petitioners' concerns—offering responsive clarifications.  Rehearing Order P30 & n. 72, P31, JA__ & __, __ (clarifying discussion of Significant Impact Levels); P58 (clarifying conclusion on GHG).  Despite Petitioners' suggestion, *see* Br. 38, there is no "uncertainty" about how FERC would have responded to their concerns.

Equally thin is Petitioners' attempt to demonstrate tangible prejudice.  Petitioners vaguely assert that—had a draft supplemental EIS been issued—they could have more fully investigated other theories for their objections.  Br. 35-36.  In

support, they point to a perceived discrepancy relating to emissions from Rio Grande and Texas LNG. *Id.* at 35. But Petitioners had months to consider the underlying data, including 30 days after FERC's Remand Order, and were able to (and did) raise concerns on rehearing. *See* Rehearing Request, JA __. While Petitioners may not be satisfied with FERC's response, no more was required. *See Crescent Trail*, 877 F.3d at 1062 (agencies need not give "point-by-point responses" to every objection raised).[3]

FERC's extensive remand process provided a meaningful opportunity to participate in the agency's decision-making process, satisfying the goals of NEPA.

## II.    FERC's environmental justice analysis reasonably responded to the Court's remand order.

*Vecinos* held that FERC had not adequately explained using a two-mile radius for evaluating the projects' impacts on environmental justice communities. *Vecinos*, 6 F.4th at 1331. On remand, FERC broadened its analysis by using a 50-km radius and concluded that environmental justice populations would bear the largest impact and thus *would* be disproportionately and adversely affected, but that those impacts remained insignificant. Remand Order PP118, 165, JA __; Rehearing Order P31,

---

[3] Petitioners mix apples and oranges in attempting to leverage their complaints about supposed deficiencies in FERC's notice-and-comment process to excuse their (months-later) jurisdictional forfeiture of certain arguments by failing to raise them on rehearing. *See* Br. 39. Petitioners raise no "reasonable ground" for failing to raise arguments on rehearing, 15 U.S.C. § 717r(b). *Cf. infra* § II.A.1.

JA __, __.  Petitioners challenge FERC's new analysis, contending that (1) FERC again inadequately explained its choice of radius and did not make a disproportionate-and-adverse impact assessment for air impacts, and (2) FERC's assessment of air impacts was methodologically flawed.  Petitioners' latest attacks lack merit.

### A.    FERC adequately explained its expanded environmental justice radius and reasonably assessed air impacts under that new radius.

An "environmental justice analysis is measured against the arbitrary-and-capricious standard."  *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) ("*Sabal Trail*").  FERC easily met this standard on remand by broadening its radius to correlate to air impacts, and directly acknowledging that there would be disproportionate and adverse air impacts on environmental justice communities.

### 1.    FERC's decision to use a 50-km radius is not properly before this Court, and in any event, is rational.

Petitioners contend that FERC's expanded 50-km radius is arbitrarily untethered from actual impacts, and noncommittally suggest a smaller distance at which a criteria pollutant falls below the EPA-defined "significant impact level." Br. 43-44.[4]

---

[4] Petitioners' challenge to FERC's chosen radius is focused on "the terminal," and not other project facilities, such as the offsite parking and storage areas for the Terminal, the underground Rio Bravo pipelines, or above-ground pipeline facilities. *See* Br. 43 (citing Remand Order P118).

At the outset, Petitioners failed to challenge FERC's decision to use a 50-km radius on rehearing.  *See* Rehearing Request, JA __ at 29 & n.83 (noting that Petitioners then believed that a smaller 12.8-km "significant impact level" radius would be inappropriate, but dropping the issue because "FERC ultimately used a wider 50 km radius").  Because petitioners did not seek rehearing on this issue, the Court lacks jurisdiction to review the 50-km radius issue.  15 U.S.C. 717r(b); *see Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2022).

In any case, FERC reasonably explained that the 50-km radius represented a "conservative estimate of the furthest possible extent of impacts, the most distant of which would be associated with air quality impacts."  Remand Order P118 & n. 268, *see also id.* PP108-110; JA __, __.  That distance was based on the science used by EPA's air-permitting program, which deems 50 km the maximum distance that criteria air pollutant impacts can potentially reach.  *See* Remand Order P118 & n. 268, JA __ (citing 40 C.F.R. § 51, app. W).

Petitioners now say that FERC should have focused on the area where air quality will be "actually" affected.  Br. 43.  But FERC's focus on the "potentially affected" area aligned with *Vecinos*' guidance.  6 F.4th at 1330 (rejecting FERC's initial two-mile delineation as arbitrary because it did not include areas "potentially affected by the project," and noting that air impacts could occur within 31 miles (*i.e.*, 50 km)); *see also Communities Against Runway Expansion v. FAA*, 355 F.3d 678,

16

689 (D.C. Cir. 2004) (affirming agency's delineation of environmental justice area consisting of population that might "conceivably be affected by" project impacts); *see also Promising Practices*, P.15 ("outer boundaries" of a potentially impacted resource can help define affected area). By contrast, the 12.8-km "significant impact level" radius is simply a modeling tool for determining when permit applicants are exempt from certain air quality analysis because impacts will be insignificant—that radius does not mark the boundary beyond which there are *no* impacts. *See, e.g., Sierra Club v. EPA*, 705 F. 3d 458, 462 (D.C. Cir. 2013). It was within FERC's discretion to take a "conservative bent rather than err on the other side." *American Iron & Steel Institute v. EPA*, 115 F.3d 979, 992 (D.C. Cir. 1997).

### 2. FERC took the requisite hard look at air quality impacts on environmental justice communities.

Petitioners contend that FERC failed to assess whether the Project would have a disproportionate and adverse—albeit insignificant—air quality impact on environmental justice communities. Br. 40-42. But FERC clearly did.

Contrary to Petitioners' claim, FERC did not simply evaluate the entire 50-km area as a single unit, without regard to discrete and localized impacts. Instead, FERC made a community-level assessment of the sort that is not vulnerable to Petitioners' dilution-by-over-inclusivity claim. Br. 44. After revising its environmental justice radius to 50 km, FERC identified all environmental justice community block groups within that area and conducted an extensive assessment of

17

the Project's impacts on each community across multiple dimensions, including air quality. Remand Order, at PP104-107, 110, 120, 122, 130-131, 139, 141, 147, 152, 161-162, Appendix B, JA__-__; *see also* R. 2967, App. A, JA__ (providing block-group-level air quality concentrations). FERC explained that terminal construction air emissions would be "highly localized and have the largest impact within a short radius around the LNG terminal," which may include "the possibility of short-term ambient emission concentrations . . . at levels above the [National Ambient Air Quality Standards ("NAAQS")] at nearby public recreational areas, such as the Laguna Atascosa National Wildlife Refuge." Remand Order, PP139, 141, JA __, __. Thus, FERC acknowledged that environmental justice communities recreating in the Refuge—located 211 feet from the terminal—"may experience adverse air quality impacts." *Id*. at P147; Rehearing Order P36, JA __. However, FERC found that air impacts would disperse before reaching the nearest residences 2.2 miles away, such that their air quality would not be adversely impacted and the NAAQS not exceeded, consistent with the state's permitting of the facility. Remand Order PP 139, 143-144, 147, 149, 151, JA __; Rehearing Order, P32, 34, JA __.

FERC concluded that "the impacts on environmental justice populations from the projects would be disproportionately high and adverse because they would be predominantly borne by the environmental justice communities identified [but, other than cumulative visual impacts that might be significant], all other impacts would

18

be less than significant." Remand Order PP206-07, JA __-__. FERC thus took the required "hard look" at impacts on environmental justice communities. *Sabal Trail*, 867 F.3d at 1368, 1376 ("NEPA does not require a particular substantive result," it "only requires . . . a 'hard look' at the problem"); *Promising Practices*, P38.[5]

Nevertheless, here FERC went beyond what NEPA required and "for the first time, *sua sponte*" imposed on Rio Grande a substantive requirement that it "file a plan to ensure that the overlapping construction and operation of project [facilities] do not cause any exceedance of the NAAQS." Remand Order, Phillips Concurrence P5, JA __; *see also id.* A-5, JA __. FERC's adoption of this 144th Environmental Condition places an extra safeguard on the Project, belying the suggestion that FERC's decisionmaking did not account for environmental justice considerations.

## B. FERC's methodology for assessing air quality impacts was reasonable.

### 1. FERC's choice of air monitors is entitled to deference.

Petitioners assert that FERC should have used data from the Isla Blanca, rather than Brownsville, air monitor and that FERC arbitrarily claimed that (1) the Isla Blanca monitor lacked three years of data, and (2) it used the Brownsville monitor

---

[5] Petitioners state that agencies ordinarily compare the affected population to some broader comparison population. Br. at 43. They did not raise this argument on rehearing, so this Court lacks jurisdiction over it. Rehearing Request at 29-30, JA __; 15 U.S.C. § 717r(b). Moreover, this kind of comparison is not the only acceptable method for reviewing environmental justice impacts. *See Promising Practices*, at 40-43; *Cmtys Against Runway Expansion*, 355 F.3d at 688-89.

19

due to its proximity to environmental justice communities.  Br. 45-47.  Petitioners'
claims fail.

First, FERC reasonably followed EPA guidance in requiring three years of
valid data for calculating PM2.5 levels, and explained that the Isla Blanca monitor
did not meet that standard when air quality data was submitted to FERC.  Rehearing
Order P27 & n. 63, JA __ & __.  Petitioners counter that the Isla Blanca monitor had
been operating for 39 months by January 2023 when Rio Grande submitted an
updated air analysis to FERC.  Br. 46-47.  But notwithstanding the duration of Isla
Blanca's *operation*, the actual data—which EPA annually computes and publishes
for the prior three years—was not validated and published until May 24, 2023, after
Rio Grande's data submission and FERC's Remand Order.  *See generally* Rehearing
Order, P27 & n. 64, JA__ & __ (citing EPA, *Air Quality Design Values*).[6]  FERC
reasonably used the most recently published EPA-validated data.  And even if newer
data had somehow become available earlier, FERC's decision to use the submitted
data—rather than starting from scratch after months of analysis, kicking off an
iterative cycle of comments and data collection—is reasonable.  *See, e.g., Village of
Bensenville v. FAA.*, 457 F.3d 52, 71 (D.C. Cir. 2006) (deferring to agency's

---

[6]  The EPA published Isla Blanca's data for the three years since it began operation—
October 2019-October 2022—on May 24, 2023.  *See* http://tinyurl.com/ta88p8sy,
"2022 Design Value Reports," PM2.5 Design Values, 5/24/2023, Appendix Monitor
Tab.

judgment in using best data available when it began its analysis, even where newer data became available later).

FERC also relied on the Brownsville monitor because it was "closer in proximity to environmental justice communities" and "adequately representative to identify impacts to potentially affected population centers."  Rehearing Order, P27, JA __; *compare* R. 2973-4, JA__ (mapping out environmental justice blocks within 50 km, illustrating that the Isla Blanca Monitor falls within a "non-EJ area."), *with* http://tinyurl.com/48epnjak (depicting location of the Monitor).  FERC's choice of air monitor is a highly technical question best left to its judgment, and it acted reasonably in considering population density and not mere distance.  *See Sabal Trail*, 867 F.3d at 1368 (deferring to "agency's choice among reasonable analytical methodologies").

### 2. FERC adequately considered cumulative ozone impacts.

Petitioners challenge FERC's ozone analysis as unsupported.  Br. 47-50.  But this Court already heard and rejected their argument that "FERC did not sufficiently analyze or consider cumulative ozone impacts." *Vecinos*, 2021 WL 3716769, *1, 4. Petitioners cannot re-litigate that question here.  *See Montana v. United States*, 440 U.S. 147, 153 (1979) (applying collateral estoppel and res judicata principles).

In any event, FERC's ozone assessment satisfied the limited remand.  When FERC initially considered ozone impacts in 2020, it examined the LNG terminal as

21

originally designed—with six liquefaction trains—along with the Texas LNG terminal, the since-withdrawn Annova LNG terminal, and projected mobile (vessel) emissions for all three terminals. FERC concluded that in the "worst case scenario," the cumulative impact on regional air quality could be significant because the ozone NAAQS could be exceeded by 6.5 ppb. FERC 2020 Rehearing Order P55, JA __. Nevertheless, FERC authorized the Project because Rio Grande adopted various mitigation measures through its air permit. *Id.* P56; *see also Vecinos*, 2021 WL 3716769, *4.

On remand, in its environmental justice review, FERC requested updated air emissions data from Texas LNG and Rio Grande, including updated ozone modeling. *See* FERC Rehearing Order in Texas LNG (CP16-116-003) P18-19, Accession 20231027-3046; Remand Order P150, JA__. FERC evaluated those results and concluded that cumulative ozone impacts would again be acceptable, particularly in light of its prior approval. Remand Order PP148, 150, JA __, __.

Citing to 40 C.F.R. § 1501.12, Petitioners now contend that FERC failed to provide the underlying ozone modeling. Br. 48. But FERC's Remand Order cites to Rio Grande's extensive submissions containing the underlying data, as did its Texas LNG order—all part of the public record. *See* Remand Order PP148-151, JA __-__; *see also* R. 2915, Attachment 1 JA__ (updated project emissions data); R. 2944, JA __ (secondary ozone estimates and standards); R. 2967, JA__ (tables with

underlying air emissions data); *see also* Rehearing Order in Texas LNG, Accession 20231027-3046, P18; Remand Order in Texas LNG, Accession 20230421-3057, PP74-76.

Petitioners suggest FERC did not adequately consider the data. But FERC explained that the background ozone concentrations were measured to be 57 ppb and observed that even with the estimated project impacts, the cumulative ozone concentrations would remain within the acceptable range. Remand Order P150, JA__; Rehearing Order PP28-29, JA__; *see also* Rehearing Order in Texas LNG, PP18-19; FERC Br. at 43-44. Petitioners complain that FERC's updated ozone assessment did not parse the impacts from vessels servicing the Rio Grande Project. But FERC had no reason to repeat those numbers, given the lack of any basis to suspect that ozone impacts would be greater—after the Project was redesigned to *eliminate* a sixth liquefaction train and the Annova Project was withdrawn—than what FERC previously accounted for and was found acceptable by both FERC and this Court. *See Vecinos*, 2021 WL 3716769, at *4. To the contrary, FERC previously concluded that the elimination of the sixth train would *reduce* ozone impacts, based on the reduction of the ozone-precursor NOx. *See* Jan. 19, 2021

Order (R. 2384), P12 & n.40, JA__& __.[7] Thus, any omission here was harmless. *See Jicarilla Apache Nation v. DOI*, 613 F.3d 1112, *1121 (D.C. Cir. 2010).

## III. FERC's GHG analysis on remand was reasonable and consistent with *Vecinos*.

### A. FERC addressed and complied with § 1502.21(c).

Petitioners criticize FERC's conclusion on remand that 40 C.F.R. § 1502.21(c) does not require it to use the Social Cost of Carbon. *See* Remand Order P92, JA___. But their criticisms provide no basis to remand or set aside FERC's orders. First, although Petitioners challenge FERC's explanation for why § 1502.21(c) did not "require" it to provide Social Cost of Carbon estimates, *id.*, FERC *did* analyze the Project's GHG emissions using that methodology and disclosed the resulting "social cost" estimates for informational purposes—*i.e.*, the precise steps Petitioners previously asked the Commission to take. *See* Br. 61, 64-67. FERC thereby discharged any possible duty under § 1502.21(c)—effectively mooting Petitioners' quarrel.

---

[7] Petitioners have not established that vessels must be considered in this analysis, as they are not considered for air permitting requirements. *See* EIS, 4-266-4-268, JA__-__. In any event, the updated data submitted by Rio Grande confirms that the ozone-precursor NOx from vessels was 84.9 tpy—far lower than the 928.7 tpy NOx that was previously deemed acceptable. *Compare* R. 2967 (Table 9-24 & Note), JA_ (providing updated vessel emissions using EPA's new 2022 Port Emissions Inventory Guidance, reflecting the Tier 4-LNG-fueled vessels serving the Terminal); *with* FERC 2020 Rehearing Order P55 n.175, JA__, *and* R.669 (Resource Report 9 Table 9.B-16), JA__ (providing emissions based on Tier 0-diesel-fueled vessels).

Section 1502.21(c) states that where information about environmental impacts is missing, agencies shall provide an "evaluation" of impacts using "theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.21(c)(3)-(4).  Here, FERC summarized the Social Cost of Carbon methodology and then "evaluat[ed]" climate-related "impacts" "based upon" that method by performing the requisite calculations.  *Id.*; *see* Remand Order PP92, 94-99, JA___, ___-___.  Petitioners do not contest FERC's calculations of Social Cost of Carbon figures based on the estimated GHG quantities here.  They identify no additional "evaluation" that could have been provided pursuant to the "theoretical approaches" or "research methods" set forth in the Social Cost of Carbon documentation issued by the Interagency Working Group responsible for its development.[8]  Thus, even if (counterfactually) FERC erred in concluding that § 1502.21(c) does not *require* using the Social Cost of Carbon, any error was harmless.  *Air Canada v. DOT*, 148 F.3d 1142, 1156-57 (D.C. Cir. 1998) (challenger must "demonstrate prejudice").

Regardless, FERC was correct that § 1502.21(c) does not require it to use the Social Cost of Carbon, because that tool was not developed for project-level review.

---

[8] *See generally* Interagency Working Grp. on Social Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990* (Feb. 2021), https://bit.ly/3rEJnyy.

*See* FERC Br. 45-51.  Petitioners say FERC offered no "explanation as to why" there is a material difference between project-level review and rulemaking.  Br. 54-55.  Not so.  An agency's task in conducting project-level NEPA review is to identify and describe the physical environmental "consequences" proximately caused by a proposed action.  40 C.F.R. § 1502.16.  This is overwhelmingly a qualitative and descriptive endeavor, as FERC's EIS here attests.  *See generally* EIS, JA___-___.  As FERC has repeatedly explained, the Social Cost of Carbon is ill-suited for such purposes because it provides only estimates of unspecified and opaque "social costs," artificially denominated in dollars—even though the underlying "costs" are largely non-monetary in nature, and even though the nominal-dollar figures are subject to order-of-magnitude variation based on a policy-driven choice of discount rate' the tool does not purport to identify or describe actual physical environmental effects causally traceable to an agency action.  *See* Rehearing Order P59 n.176, JA___-___ (citing *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) ("*Alaska LNG*")); *accord* FERC's 2020 Rehearing Order P104, JA___-___.  Such estimates are not informative and may even mislead when injected into a NEPA analysis designed to identify "a specific project's impacts" in qualitative terms.  FERC's 2020 Rehearing Order P104, JA___; *accord* 40 C.F.R. § 1502.22

(NEPA analyses "should not" use cost-benefit monetization methods "when there are important qualitative considerations").[9]

Petitioners respond that a non-binding Council on Environmental Quality ("CEQ") interim guidance document endorsed the Social Cost of Carbon's use for "most" NEPA analyses, and that some other agencies have provided Social Cost of Carbon estimates. Br. 53-54 & n.10. But CEQ's guidance imposes no legal requirements on FERC, *see* 88 Fed. Reg. 1196, 1197 n.4 (Jan. 9, 2023); *cf.* Rehearing Order P56, JA___ (similar, as to prior CEQ guidance). CEQ's belief that the Social Cost of Carbon is worth including in "most" NEPA documents, 88 Fed. Reg. at 1202, does not speak to whether the tool is "generally accepted *in the scientific community*" for that purpose, 40 C.F.R. § 1502.21(c)(4) (emphasis added), nor do a handful of examples of other agencies providing Social Cost of Carbon calculations in NEPA documents in different contexts. Section 1502.21 does not impose a test of conformity with the policy decisions, much less non-binding policy guidance, of other regulatory bodies.

---

[9] Use of Social Cost of Carbon estimates for programmatic purposes—such as comparing the relative effects of different potential coastal or offshore leasing programs, *see* Br. 54 & n.10—does not establish a practice for *project*-level reviews. *See* Bureau of Land Mgt., Draft Supplemental EIS for Coastal Plain Oil and Gas Leasing Program at 1 (2023) (NEPA document "considers three action alternatives for . . . an oil and gas leasing program" but "any on-the-ground [exploration or drilling] activity . . . would require further NEPA analysis based on the site-specific proposal"), http://tinyurl.com/3xwuwp3u.

Even if the Social Cost of Carbon were "generally accepted in the scientific community" for project-level NEPA reviews, it does not assist in determining "whether the reasonably foreseeable GHG emissions associated with a project are significant." Remand Order P93, JA___. The Social Cost of Carbon provides "no criteria to identify what monetized values are significant for NEPA purposes," nor is there any other scientifically accepted source for such criteria. *Id*. Therefore, § 1502.21(c) did not require its use here, because the tool cannot provide the "relevant" "information" that FERC determined it could not "obtain[]," 40 C.F.R. § 1502.21(c)—namely a scientifically sound criterion or method for determining whether the Project's "contribution to climate change" was "significant." *Vecinos*, 6 F.4th at 1331 (quoting Authorization Order P109, JA___). Finally, Petitioners ignore on appeal other reasons the Commission articulated defending its decision. *See* Rehearing Order P59 n.176 (quoting *Alaska LNG*, 67 F.4th at 1184); FERC Br. 46-47 & n.5.

## B. FERC Was Not Required to Determine Whether the Project's GHG Emissions Will Be "Significant" Via "Ad-Hoc" "Policy Judgment."

Petitioners' real complaint is that FERC did not declare the Project's GHG emissions "significant" under NEPA—a conclusion Petitioners themselves have reached, apparently, based on their subjective intuition that the GHG emissions here are "large" in some unspecified sense. Petitioners seek a "significance" finding as a

step toward compelling FERC to disregard NEPA's procedural nature and to deny project authorizations or impose billions in climate mitigation. *See* Br. 59. But Petitioners do not contest FERC's observation that the Social Cost of Carbon, by its terms, provides no criteria for deciding whether particular GHG emissions are "significant" or not. Remand Order P93, JA___. Instead, they argue that FERC should have gone beyond the Social Cost of Carbon methodology, and "exercise[d] its policy judgment" to decide that issue. Br. 55-56 (citation omitted). Although Petitioners are vague on specifics, they suggest that FERC should have looked at the Project's GHG emissions (in tons or dollars), and then decided—apparently by arbitrary "policy"-based fiat—whether that number is "facially significant." *Id.* at 58; *accord id.* at 55-56. This argument fails.

First, the demand for FERC to exercise its "policy" judgment to decide whether GHG emissions are "significant" falls "outside the scope of th[is] court's remand," Rehearing Order P54, JA___, and therefore FERC was not required to address it, *see id.* P13, JA___. This Court directed FERC to consider the relevance of § 1502.21(c), not whether FERC had a broader duty, grounded in some other source of law, to decide whether the Project's GHG emissions would be "significant." Petitioners seize on this Court's statement that FERC should consider on remand whether § 1502.21(c) requires the use of the Social Cost of Carbon "or some other analytical framework." *Vecinos*, 6 F.4th at 1330. But suggesting that

FERC pick an arbitrary numerical threshold for when GHG emissions from a single project are "significant," absent any objective criteria or legal standard for doing so, is not an "analytic method." Petitioners do not (and could not) contend that the exercise of "policy" judgment they urge is a "theoretical approach[]" or "research method[]" that is "generally accepted in the scientific community." 40 C.F.R. § 1502.21(c)(4).[10] Because § 1502.21(c) is irrelevant to whether FERC lawfully can or should make a "significance" determination based on such open-ended policy judgment, the issue is beyond the remand's scope.

Second, even looking beyond § 1502.21, Petitioners cite *nothing* in NEPA requiring FERC to make a binary determination as to whether project-related GHG emissions would be "significant" or "insignificant." To be sure, agencies may be required to determine that project impacts, overall, will be "insignificant" if they decide not to prepare an EIS. *See Env't Health Tr. v. FCC*, 9 F.4th 893, 900-901 (D.C. Cir. 2021) (agency must prepare EIS if proposed action stands to "significantly" affect the environment) (quoting 42 U.S.C. § 4332(c)); *accord* 40

---

[10] To the extent Petitioners suggest FERC "failed to respond" to their rehearing suggestion that it make an "ad-hoc determination," Br. 57, 59, that is incorrect. FERC addressed the relevant portion of Petitioners' rehearing request, correctly explaining that the arguments therein—which included the suggestion that FERC should make an "ad-hoc determination," Rehearing Request 46, JA___—were "outside the scope of the court's remand." Rehearing Order P54 & n.161, JA___ & __ (citing Rehearing Request PP46-47, JA___-___).

C.F.R. § 1502.3. Here, however, FERC *did* prepare an EIS. Having done so, FERC was not required to characterize particular impacts as "significant" or "insignificant" in some binary, absolute sense—but only to "discuss[]" the "*significance*" of environmental effects. 40 C.F.R. § 1502.16 (emphasis added). Here, FERC discussed the significance of the projects' GHG emissions. *See* FERC Br. 52-53. In any event, any suggestion that FERC violated § 1502.16 is forfeited for failure to raise it on rehearing. *See* FERC Br. 51.

Finally, Petitioners cite 18 C.F.R. § 380.7, which they contend "require[s] [FERC] to identify all 'significant environmental impacts.'" Br. 57. In addition to being beyond the remand's scope, any contention that FERC violated this regulation is jurisdictionally forfeited for failure to raise it on rehearing. *See* FERC Br. 51. Regardless, the regulation states only that a FERC EIS will include a "staff conclusion section" that, in turn, "will include summaries of" (*inter alia*) the project's "significant environmental impacts." 18 C.F.R. § 380.7. The EIS for the Project did include a staff conclusion section, *see* EIS at 5-1 to 5-47, JA___-___, which summarized GHG emissions and climate-related impacts therefrom, *id.* at 5-22, JA___.

### C. FERC Properly Addressed Public Interest and Public Convenience and Necessity.

*Vecinos* also directed FERC to reconsider its NGA analyses on remand, after remedying the issues regarding environmental justice and GHGs. *Vecinos*, 6 F.4th

at 1331. FERC did so. It reiterated the standards it applies when evaluating LNG export and pipeline projects under NGA Sections 3 and 7, respectively. Rehearing Order PP48-49, 52, JA___-___, ___-___. And it reincorporated and reiterated its analysis of the overwhelming majority of the factors relevant to the Project (unchanged on remand), as set forth in the Authorization Order. *Id.* PP50, 52, JA___, ___. FERC concluded that none of the information disclosed on remand "undermine[d]" its original conclusions under Sections 3 and 7. *Id.* PP50-52, JA___-___. It expressly reaffirmed those conclusions. Remand Order PP3, 208, JA___, ___. *Vecinos* required nothing more.

## IV. Petitioners' CCS-related arguments are not properly before this Court.

Unrelated to the two remand issues, Petitioners argue that Rio Grande's new CCS proposal is intertwined with the Project, and therefore FERC should have jointly reviewed the two actions before it issued its Remand Order. Br. 61-70. Petitioners are improperly attempting to reopen the underlying EIS. Petitioners already had the opportunity to challenge the scope of FERC's EIS for the Project, and judgment was entered against them on those issues. They cannot re-litigate those issues now. Moreover, FERC reasonably decided that the CCS proposal was not a connected action or significant new information and should instead be considered in a separate proceeding in which Petitioners can participate and potentially challenge any decision that ripens.

**A.    Petitioners cannot re-litigate the EIS' choice of project alternatives.**

In the prior appeal, Petitioners raised many challenges to the EIS's scope, including that FERC should have analyzed alternative project designs that might have had less environmental impact—such as a smaller terminal design and lower-capacity pipeline alternative.  *See* Opening Brief at 24-36, D.C. Cir. Case No. 20-1045.  This Court rejected those arguments.  *Vecinos*, 2021 WL 3716769, at *1, 3.  Now, Petitioners argue that FERC cannot re-authorize the Project because its environmental analysis did not consider the CCS system as a "mitigation or design alternative."  Br. 62.  Whether or not a CCS system could have been a proper alternative at the time of the Project's initial authorization, Petitioners cannot now bring a belated challenge to the EIS's range of Project alternatives.  That issue is outside the remand's limited scope, which called for further proceedings only on two discrete issues and explicitly declined to vacate the original authorization.  *Vecinos*, 6 F.4th at 1331-32.  This Court rejected all Petitioners' other arguments, entering a judgment with preclusive effect.  *See* 18A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4434 n. 2 (3d ed. 2023) (finality test for the doctrine of res judicata is "satisfied by a ruling on appeal that remanded for further proceedings only on other matters") (*citing Syverson v. International Business Machines Corp.*, 472 F.3d 1072, 1079 (9th Cir. 2007)).

33

Although FERC reacquired jurisdiction on remand, that did not automatically re-open the EIS or require FERC to consider a broader range of issues beyond the remand's scope. *Cf. Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 298 (D.C. Cir. 2001) (distinguishing between the requirements on remand and the agency's discretion to reconsider the whole of its decision on remand). Here, FERC reasonably declined to consider the CCS proposal as part of the Project on remand because it was separately reviewing the CCS proposal and that review was paused while FERC sought additional information from Rio Grande. FERC Docket No. CP22-17-000.

### B.    FERC reasonably chose to review the CCS proposal in a separate proceeding.

FERC has not yet completed its NEPA review of the CCS proposal, much less issued a final decision; therefore, the CCS proposal is itself not ripe for consideration by this Court. Nonetheless, Petitioners contend that the CCS proposal is intertwined with the Project, either as (1) a new mitigation design that constitutes significant new information, or alternatively, as (2) a connected action. Both issues are reviewed under the arbitrary-and-capricious standard. *Stand Up for California!*, 994 F.3d at 628; *City of Boston Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018). Applying that standard here, FERC's decisions are entitled to deference.

34

### 1. FERC reasonably concluded that the CCS proposal did not constitute significant new information.

An agency need not repeat its environmental analysis every time something new comes to light; instead, as discussed in Part I, *supra*, the question is whether the new information or circumstances reveal "a seriously different picture of the impact of the project." *Stand Up for California!*, 994 F.3d at 629 (cleaned up and emphasis added). FERC rejected Petitioners' argument that the CCS proposal constituted significant new information or circumstances, concluding that the CCS proposal would not ultimately alter how FERC had viewed the Project and the alternatives in the earlier EIS. Rehearing Order P23, JA __.

On appeal, Petitioners make no effort to explain how a mere proposal can constitute a significant new circumstance, much less demonstrate why FERC's determination was arbitrary and capricious. Petitioners analogize to *Alaska Wilderness Recreation and Tourism Association v. Morrison*, 67 F.3d 723 (9th Cir. 1995), but that case is inapt. Br. 69. There, the Ninth Circuit required the agency to complete a supplemental EIS in recognition of significantly changed conditions resulting from the cancellation of a long-term contract upon which the agency's chosen alternative depended. *Alaska Wilderness*, 67 F.3d at 728-30. But here, the existence and plausibility of CCS was not relevant to the original authorization, its assumptions, or potential alternatives. Rehearing Order, P23, JA __. FERC

35

provided a fact-intensive explanation for why a supplemental EIS was not required, and that determination is due deference.

### 2.    FERC reasonably concluded that the CCS Proposal is not a connected action.

Petitioners also argue that FERC improperly segmented its NEPA review by issuing the remand order before finishing its review of the CCS proposal—a proposal that Petitioners say is a "connected action" under CEQ regulations.  Br. 65-66 (citing 40 C.F.R. §§ 1501.9(e)(1), 1508.1).  FERC reasonably decided otherwise.

"An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration."  *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).  This requirement "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015).  When evaluating if "physically connected actions can be analyzed separately under NEPA," this Court considers whether the projects were considered "non-contemporaneously" and have "substantial independent utility."  *City of Boston Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018).  These factors readily

support FERC's decision to separately consider the CCS proposal.  Rehearing Order P18-20, JA __-__.

First, as FERC explained, the Project and the CCS proposal lacked the requisite temporal overlap.  Here, FERC completed its EIS and authorized the Project before the CCS proposal had even been submitted, and the Project is now underway while the CCS proposal remains pending and its environmental review has yet to be scheduled.  Accordingly, the contemporaneous-timing factor that can raise real segmentation concerns is absent here. *See Minisink*, 762 F.3d at 113 n. 11 (no segmentation where the application for the later-in-time project had yet to be submitted when the main project was under consideration); *City of Bos. Delegation*, 897 F.3d at 252 (no temporal overlap where Commission had approved one project before the other projects' applications had been submitted).

Second, the authorized Project has substantial independent utility—as Petitioners do not contest.  Petitioners instead contend that the projects are connected because the *CCS system* would have no substantial independent utility absent the LNG Terminal, and that its lack of independent utility ensnares the larger project into a new joint NEPA process.  Br. 66.  Petitioners' argument finds no support in case law and would induce perverse incentives.

While Petitioners cite cases in which multiple projects each had independent utility, *see id.*, those cases did not hold that such bilateral independence was required.

37

Indeed, the cases ask simply "whether one project will serve a significant purpose even if a second related project is not built." *City of Bos. Delegation*, 897 F.3d at 252 (*citing Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987)). Here, the authorized Project will serve a significant purpose even if the proposed CCS system is never built—the Project is proceeding and remains financially and functionally independent.

Moreover, FERC's actions do not implicate segmentation, which seeks to prevent agencies from dividing one project into several smaller projects to reduce a project's stated impacts and avoid triggering an EIS. *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F. 2d 294, 298 (D.C. Cir. 1987). Here, FERC already acknowledged that the Project required an EIS, disclosed the impacts, and authorized the Project with a number of environmental conditions, but without a CCS system.

Finally, the doctrine of segmentation is ill-fitting here. Applicants can and should be encouraged to refine projects and adopt beneficial changes that the agency could not have required through its environmental review. To require an already-authorized project to undergo an entirely new NEPA review because the applicant voluntarily proposed a beneficial measure would disincentivize innovation and invite litigation.

38

**V.    If the Court grants any relief, it should remand without vacatur.**

This Court should deny the petition.  But if the Court finds merit in any claims, it should remand without vacatur.  "The decision to vacate depends on two factors: the likelihood that deficiencies in an order can be redressed on remand" and "the disruptive consequences of vacatur."  *Vecinos*, 6 F.4th at 1332.  In urging vacatur, Petitioners offer a conclusory assertion that Respondents will not be able to show that vacatur would be disruptive.  *See* Br. at 71.  But just as in *Vecinos*, both the *Allied-Signal* factors counsel against vacatur.

First, even if the Court concludes that certain aspects of FERC's analysis require further explanation, *Vecinos* already held that the discrete issues that remain in this matter are of the type that can likely be redressed on remand.  *Vecinos*, 6 F.4th 1332.  The nature of the issues has not changed—the issues Petitioners raise here remain procedurally focused—and if anything, they are now more cabined.  *See generally* Br. (asserting deficiencies of explanation and NEPA analysis).

Second, the Court previously acknowledged the disruptive consequences of vacatur for this multi-billion dollar infrastructure project, *id.*, a conclusion that holds *a fortiori* now, where the Project developers have spent several more years and have invested billions of dollars in reliance on FERC's authorizations.  Rio Grande has executed numerous binding, long-term LNG offtake agreements with commercial counterparties, and it has been undertaking significant work onsite since July 2023.

39

*See Intervenors' Opposition to Stay Motion*, Case No. 23-1174, D.C. Cir. (Feb. 12, 2024) (attaching declarations from terminal and pipeline developers detailing harms from interruption in FERC authorizations).  Vacatur would have extremely serious financial consequences, jeopardizing Rio Grande's ability to deliver vitally needed supplies to its customers.  *Id.*

Vacatur would disrupt Rio Bravo's ongoing efforts to develop and permit the pipeline.  If Rio Bravo's permitting and construction schedule were disrupted, it would unnecessarily delay or deprive the public of the many "benefits that the [] Pipeline Project will provide by enabling the transport of domestically-sourced gas to Rio Grande's LNG Terminal."  Certificate Order at 15, JA__.  These benefits include "contributing to the development of the gas market, in particular the supply of reasonably-priced gas; adding new transportation options for producers, shippers, and consumers; boosting the domestic economy and the balance of international trade; and supporting domestic jobs."  2020 Rehearing Order at 9, JA__; *Intervenors' Opposition to Stay Motion*.

## CONCLUSION

The petition should be denied, or, where appropriate, dismissed for want of jurisdiction.

40

Date: February 12, 2024

*/s/ Jeremy C. Marwell*
*(by permission)*

Jeremy C. Marwell
Matthew X. Etchemendy
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
jmarwell@velaw.com

*Counsel for Respondent-Intervenor*
*Rio Bravo Pipeline Company, LLC*

Respectfully submitted,

*/s/ Varu Chilakamarri*

Varu Chilakamarri
David L. Wochner
John Longstreth
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
varu.chilakamarri@klgates.com

*Counsel for Respondent-*
*Intervenor Rio Grande LNG, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Circuit Rule 32(e)(2) because it contains 9063 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

Date: February 12, 2024        */s/ Varu Chilakamarri*
                              Varu Chilakamarri
                              K&L Gates LLP
                              1601 K Street, NW
                              Washington, DC 20006
                              Phone: 202.778.9000
                              varu.chilakamarri@klgates.com

                              *Counsel for Respondent-*
                              *Intervenor Rio Grande LNG, LLC*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on February 12, 2024, I electronically filed the foregoing *Joint Answering Brief for Respondent-Intervenors* with the Clerk of the Court for the U.S. Court of Appeals for the D.C. Circuit using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Date: February 12, 2024

*/s/ Varu Chilakamarri*
Varu Chilakamarri
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
varu.chilakamarri@klgates.com

*Counsel for Respondent-
Intervenor Rio Grande LNG, LLC*